SEUFERT BROTHERS COMPANY *v.* UNITED STATES, AS TRUSTEE AND GUARDIAN OF THE CONFEDERATED TRIBES AND BANDS OF THE YAKIMA INDIANS AND NATIONS, ET AL.

UNITED STATES, AS TRUSTEE AND GUARDIAN OF THE CONFEDERATED TRIBES AND BANDS OF THE YAKIMA INDIANS AND NATIONS, ET AL. *v.* SEUFERT BROTHERS COMPANY.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

Nos. 187, 188.    Argued January 29, 30, 1919.—Decided March 3, 1919.

The right secured to the Yakima Indians, through their treaty of June 9, 1855, Art. III, 12 Stat. 25, of taking fish at all usual and accustomed places, in common with citizens of the United States, and of erecting temporary buildings for curing them, extends to places in Oregon on the south side of the Columbia River, where these Indians habitually fished before and since the treaty, even though beyond the limits of the Yakima cession and within the region covered by the similar provision in favor of the Walla-Walla and Wasco tribes.    (12 Stat. 37.)    P. 196.

This provision is not to be construed technically and strictly as an exception from the general cession made by the Yakimas of lands north of the river, but must be given effect in accordance with the broad terms used, as understood by the Indians.    P. 198.

233 Fed. Rep. 579, affirmed.

The case is stated in the opinion.

*Mr. H. S. Wilson,* with whom *Mr. A. S. Bennett* was on the briefs, for Seufert Brothers Co.

*Mr. Assistant Attorney General Brown,* with whom *Mr. Leonard Zeisler* was on the brief, for the United States, as trustee, etc., *et al.*

MR. JUSTICE CLARKE delivered the opinion of the court.

As trustee and guardian of the Yakima Indians, the Government of the United States instituted this suit in the Federal District Court for the District of Oregon to restrain defendant, a corporation, its officers, agents and employees, from interfering with the fishing rights in a described locality on the south side and bank of the Columbia River, which it was alleged were secured to the Indians by Article III of the treaty between them and the United States, concluded June 9, 1855, and ratified by the Senate on March 8, 1859 (12 Stat. 25).

The District Court granted in part the relief prayed for and found as follows: That the "following described portion of the south bank of the Columbia river in the county of Wasco, state and district of Oregon, was at the time of the treaty, always has been, and now is, one of the usual and accustomed fishing places belonging to and possessed by the Confederated Tribes and Bands of Indians known as the Yakima Nation." And the court further decreed that the rights and privileges to fish in common with citizens of the United States reserved by said Yakima Nation and guaranteed by the United States to it in the treaty of June 9, 1855, applied to all the usual and accustomed fishing places on the south bank or shore of the Columbia River, in the decree described.

An appeal from the decree granting an injunction brings the case here for review.

As stated by counsel for the appellant the most important question in the case is this, "Did the treaty with the Yakima tribes of Indians, ceding to the United States the lands occupied by them, on the north side of the Columbia River in the Territory of Washington," and reserving to the Indians "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory" give them the right to fish in the country of another

tribe on the south or Oregon side of the river? The appeal requires the construction of the language quoted in this question, and the circumstances incident to the making of the treaty are important.

Fourteen tribes or bands of confederated Indians, which, for the purposes of the treaty were considered as one nation under the name of Yakima Nation, at the time of the making of the treaty occupied an extensive area in the Territory, now State, of Washington, which is described in the treaty, and was bounded on the south by the Columbia River. By this treaty the Government secured the relinquishment by the Indians of all their rights in an extensive region, and in consideration therefor a described part of the lands claimed by them was set apart for their exclusive use and benefit as an Indian reservation, and in addition fishing privileges were reserved to them by the following provision in Article III:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, *as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them.*"

This treaty was one of a group of eleven treaties negotiated with the Indian tribes of the northwest between December 26, 1854, and July 16, 1855, inclusive. Six of these were concluded between June 9th and July 16th, inclusive, and one of these last, dated June 25th, was with the Walla-Walla and Wasco tribes, "residing in Middle Oregon," and occupying a large area, bounded on the north by that part of the Columbia River in which the fishing places in controversy are located (12 Stat. 37). This treaty contains a provision for an Indian reservation and one saving fishing rights very similar in its terms to that of the Yakima treaty, viz: "That the exclusive right of taking fish in the streams running through and

bordering said reservation is hereby secured to said Indians; and at all other usual and accustomed stations, in common with citizens of the United States, and of erecting suitable houses for curing the same."

These treaties were negotiated in a group for the purpose of freeing a great territory from Indian claims, preparatory to opening it to settlers, and it is obvious that with the treaty with the tribes inhabiting Middle Oregon in effect, the United States was in a position to fulfill any agreement which it might make to secure fishing rights in, or on either bank of, the Columbia River in the part of it now under consideration,—and the treaty was with the Government, not with Indians, former occupants of relinquished lands.

The District Court found, on what was sufficient evidence, that the Indians living on each side of the river, ever since the treaty was negotiated, had been accustomed to cross to the other side to fish, that the members of the tribes associated freely and intermarried, and that neither claimed exclusive control of the fishing places on either side of the river or the necessary use of the river banks, but used both in common. One Indian witness, says the court, "likened the river to a great table where all the Indians came to partake."

The record also shows with sufficient certainty, having regard to the character of evidence which must necessarily be relied upon in such a case, that the members of the tribes designated in the treaty as Yakima Indians, and also Indians from the south side of the river, were accustomed to resort habitually to the locations described in the decree for the purposes of fishing at the time the treaty was entered into, and that they continued to do so to the time of the taking of the evidence in the case, and also that Indians from both sides of the river built houses upon the south bank in which to dry and cure their fish during the fishing season.

This recital of the facts and circumstances of the case renders it unnecessary to add much to what was said by this court in *United States* v. *Winans*, 198 U. S. 371, in which this same provision of this treaty was considered and construed. The right claimed by the Indians in that case was to fishing privileges on the north part and bank of the Columbia River—in this case similar rights are claimed on the south part and bank of the river.

The difference upon which the appellant relies to distinguish this from the former case is that the lands of the Yakima Indians were all to the north of the river and therefore it is said that their rights could not extend beyond the middle of that stream, and also that since the proviso we are considering is in the nature of an exception from the general grant of the treaty, whatever rights it saves must be reserved out of the thing granted, and as all of the lands of the Yakima tribes lay to the north of the river it cannot give any rights on the south bank.

But in the former case (*United States* v. *Winans, supra*), the principle to be applied in the construction of this treaty was given this statement:

"We will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' 119 U. S. 1; 175 U. S. 1."

How the Indians understood this proviso we are considering is not doubtful. During all the years since the treaty was signed they have been accustomed habitually to resort for fishing to the places to which the decree of the lower court applies, and they have shared such places with Indians of other tribes from the south side of the river and with white men. This shows clearly that their understanding of the treaty was that they had the right

to resort to these fishing grounds and make use of them in common with other citizens of the United States,—and this is the extent of the right that is secured to them by the decree we are asked to revise.

To restrain the Yakima Indians to fishing on the north side and shore of the river would greatly restrict the comprehensive language of the treaty, which gives them the right "of taking fish at all usual and accustomed places, . . . and of erecting temporary buildings for curing them," and would substitute for the natural meaning of the expression used,—for the meaning which it is proved the Indians, for more than fifty years derived from it,—the artificial meaning which might be given to it by the law and by lawyers.

The suggestion, so impressively urged, that this construction "imposes a servitude upon the Oregon soil" is not alarming from the point of view of the public, and private owners not only had notice of these Indian customary rights by the reservation of them in the treaty, but the "servitude" is one existing only where there was an habitual and customary use of the premises, which must have been so open and notorious during a considerable portion of each year, that any person, not negligently or wilfully blind to the conditions of the property he was purchasing, must have known of them.

The only other questions argued by the appellant relate to the claims which counsel anticipated would be made on the cross-appeal by the Government, which, however, was abandoned before oral argument and must be dismissed. It results that the decree of the District Court must be

*Affirmed.*