261 P.2d 135

**STATE v. ARTHUR.**
No. 7959.

Supreme Court of Idaho.
Aug. 21, 1953.

Rehearing Denied Oct. 6, 1953.

------◆------

Robert E. Smylie, Atty. Gen., J. R. Smead, Asst. Atty. Gen., Robert M. Robson, former Pros. Atty., Grangeville, for appellant.

Paul G. Eimers, Grangeville, T. H. Little, Clarkston, Wash., for respondent.

254

THOMAS, Justice.

Respondent, David Arthur, hereinafter referred to as the defendant, is a Nez Perce Indian and a member of the Nez Perce tribe ·of Indians. He was charged with killing a deer out of season, on September 26, 1951, in Idaho County, on National Forest lands, outside the boundaries of the reservation but within the exterior boundaries of lands ceded to the federal government by such Indian tribe, in violation of Section 36–104, I.C., and the regulations of the Idaho Fish and Game Commission.

Defendant filed a demurrer to the complaint on the ground that the facts charged therein do not constitute a crime, and on the further ground that the complaint contains matters which, if true, constitute a legal bar to the action under the terms of the Treaty of 1855, negotiated between the Nez Perce tribe and other tribes and the United States government. Treaty of 1855, 12 Stat. 957, II Kappler, 702.

The demurrer was sustained and judgment entered dismissing the case and discharging defendant. This appeal was taken

by the State from the order sustaining the demurrer and from the judgment dismissing the action and discharging defendant.

The only question presented on this appeal is whether the defendant, as a member of the Nez Perce tribe, was entitled to hunt wild game on lands ceded by the Nez Perce tribe to the United States by the Treaty of 1855, which lands are now a part of the Nez Perce National Forest, during the closed season in disregard of the statutory laws of Idaho.

From May 22, 1855 through June 11, 1855, a meeting between the Nez Perce and other Indian tribes, including the Yakimas, and representatives of the United States government was held at the Council Grounds in Walla Walla Valley. Governor Isaac I. Stevens, of the Territory of Washington, and General Joel Palmer, of the Territory of Oregon, represented the Federal Government, and Chiefs and various spokesmen of the tribes represented the Indians. The extended negotiations culminated in the Treaty of June 11, 1855, whereby the Indians for monetary and other considerations ceded to the United States a vast territory exceeding 16,000 square miles in area. Article 3 of the Treaty with relation to the Nez Perce tribe provides as follows:

"Article III. * * * The exclusive right of taking fish in all the streams where running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

The State contends that no federal rights were reserved in the Admission Act admitting Idaho to statehood on an equal footing with the original states in all respects, Idaho Code, Vol. 1, p. 37, 26 Stat. at L. 215, ch. 656; additionally, the State contends that no such power was delegated the federal government under the Idaho Constitution, Art. 21, § 19, I.C.; also that the lands upon which the killing occurred, having been set apart and reserved as a National Forest Reserve is neither "open" nor "unclaimed" land, consequently the Nez Perce Indians are subject to the laws of this state fixing the time when wild game may be killed.

On the other hand, defendant urges that the reserved right to hunt on the ceded lands, unlike the reserved right to fish, was not in common with the citizens of the territory but constituted an unqualified, continuing property right reserved by the tribe and is not subject to state regulations but is controlled by the Treaty of 1855 which is supreme until such reserved right is extinguished by treaty, agreement, or act of Congress.

There were subsequent treaties and agreements between the Nez Perce Indians and the United States expressly continuing in full force and effect all the provisions of the Treaty of 1855 not abrogated or specifically changed or which were not inconsistent with the provisions thereunder. Nez Perce Treaty of 1863, 14 Stat. 647, II Kappler Indian Laws and Treaties 843; Nez Perce Agreement of May 1, 1893, 28 Stat. 327, I Kappler Indian Laws and Treaties 536; see also State v. McConville, 65 Idaho 46, 139 P.2d 485.

An examination of the Treaty of 1863 and the Agreement of 1893 discloses that the right or privilege of hunting upon open and unclaimed lands was not thereby extinguished or abolished; whatever the nature and scope of the right in this respect reserved in the Treaty of 1855, it still remains unless otherwise extinguished by the Admission Act admitting Idaho into the Union in 1890.

The Organic Act creating the Territory of Idaho under date of March 3, 1863, 12 Stat. 808, provides as follows in respect to Indian rights and territory:

"Section 1. * * * Provided, further, That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribes, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the Territory of Idaho, until said tribe shall signify their assent to the President of the United States to be included within said Territory, or to affect the authority of the Government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the Government to make if this act had never passed."

Section 17 of the Organic Act provides:

Treaties with Indians—Duty to keep and observe.—"All [treaties] laws, and other engagements made by the Government of the United States with the Indian tribes inhabiting the Territory embraced within the provisions of this act, shall be faithfully and rigidly observed, anything contained in this act to the contrary notwithstanding; and that the existing agencies and superintendencies of said Indians be continued with the same powers and duties which are now prescribed by law, except that the President of the United

States may, at his discretion, change the location of the office of said agencies or superintendents."

Art. 21, § 19, Idaho Constitution, provides as follows:

"Religious freedom guaranteed— Disclaimer of title to Indian lands.— * * *. And the people of the state of Idaho do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indians or Indian tribes; and until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; * *."

■ Nowhere within the provisions of the Admission Act or the Constitution of this State is there any expressed intention to abrogate or extinguish any of the provisions of the Treaty of 1855 nor to relieve the State of the obligations thereof. The repeal of such provisions by implication is not favored, United States v. Domestic Fuel Corp., 71 F.2d 424, 21 C.C.P.A., Customs, 600; a treaty entered into in accordance with the requirement of the Constitution has the force and effect of a legislative enactment and is for all purposes equivalent to an Act of Congress, becoming the law of the United States and of such

state, and is binding upon each sovereignty, anything in the Constitution or laws of any state to the contrary notwithstanding, Valentine v. Neidecker, 299 U.S. 5, 57 S. Ct. 100, 81 L.Ed. 5; moreover, if there be a conflict between such a treaty and the provisions of a state constitution or statutory enactment, whether enacted prior or subsequent to the making of a treaty, the treaty will control. Santovincenzo v. Egan, 284 U.S. 30, 52 S.Ct. 81, 76 L.Ed. 151; Nielsen v. Johnson, 279 U.S. 47, 49 S.Ct. 223, 73 L.Ed. 607; In re Infelise's Estate [Melzner v. Trucano], 51 Mont. 18, 149 P. 365; 52 Am.Jur., sec. 18, p. 816, sec. 21, p. 818; Annotation 4 A.L.R. 1377.

■ While the Admission Act itself was silent in respect to the rights of the Indians, both the Organic Act and Constitution of Idaho recognize their rights which arose under the Treaty of 1855 and subsequent agreements and treaties prior to statehood; additionally, the Agreement of 1893, subsequent to statehood, expressly provided that the provisions of all former treaties with the Nez Perce Indians which were not inconsistent with the Agreement of 1893 were continued in full force and effect, 28 Stat. 331; moreover, the admission of Idaho into the Union does not operate to repeal the reserved right, whatever its scope, to hunt upon "open and unclaimed land", Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340; Tulee v. State of Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115; also a reservation of

such rights was intended to be continued against the United States and its grantees as well as the State and its grantees, United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089; neither is such a provision in the treaty an invasion of the sovereignty of the state admitted into the Union upon an equal footing with other states. Dick v. United States, 208 U.S 340, 28 S.Ct. 399, 52 L.Ed. 520; Winters v. United States, supra.

The State relies principally upon the case of Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244. This case was decided in 1896. Race Horse, a Bannock Indian, claimed the right to hunt under the Fort Bridger Treaty of 1868. 15 Stat. 673, II Kappler 1020. Article 4 of the treaty provides as follows:

"The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

Wyoming was admitted to the Union in 1890 and enacted a statute regulating the killing of game within the state. Race Horse was prosecuted for violation of such state law. The place where the game was killed was within the hunting district referred to in the Treaty of 1868. The Supreme Court of the United States, sustaining the position of the State of Wyoming, held that the right or privilege reserved under the treaty was temporary and precarious and that Wyoming having been admitted to statehood under the express declaration that it should have all the powers of the other states, and no express reservation having been made in favor of the Indians, the Admission Act and the State Constitution being in conflict with the treaty rights operate to impliedly repeal or abrogate the rights of the Indians under the treaty. The author of the opinion expressed the view that all the parties to the treaty contemplated the advance of civilization and that it was never intended that the right should be continuing and further the right being temporary and precarious ceased to exist when the territory ceased to be a part of the hunting district and came within and under the jurisdiction of the state. Apparently no resort was had to the minutes made preceding the execution of the treaty but the intent was determined wholly from the wording of the particular article of the treaty, the absence of any reserved rights in the Admission Act, and the changes and developments which followed rather than the conditions as they existed at the time. Upon these principles and no others the court concluded that it was quite plain that a conflict existed between the treaty and the

Act of Admission resulting in a repeal of the rights under the treaty. This argument would be without force and effect in the instant case for the reason that in the Agreement of 1893, after statehood, the United States expressly recognized that the rights of the Nez Perce Indians in the Treaty of 1855 remained in full force and effect to the extent that those rights did not conflict with any of the provisions of the Treaty of 1863 or the Agreement of 1893. There was no conflict respecting the right of hunting; moreover, it is quite clear that the United States intended that such rights should be continuing and remain until they were extinguished by appropriate means which did not include the admission of Idaho into the Union. Furthermore, later opinions of the United States Supreme Court indicate that the decision in the Race Horse case has not been followed on this proposition. See United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089; Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340; Dick v. United States, 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520; Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555; Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115.

In the case of United States v. Winans, supra, the Supreme Court had under consideration the Stevens Treaty of 1855 with reference to the Yakima Indians. The language therein is the same as appertains to the Nez Perce tribe under the same date.

The respondents excluded the Indians from lands bordering on the Columbia River which were within the area that the Yakimas had ceded but upon which they claimed a servitude. Respondents urged that the Race Horse case was controlling and that upon the admission of Washington to statehood the treaty reservation was repealed. This contention was rejected and the rights of the Indians sustained. In doing so the Court said [198 U.S. 371, 25 S.Ct. 664]:

"The reservations were in large areas of territory, and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein. * * *

"The contingency of the future ownership of the lands, therefore, was foreseen and provided for; in other words, the Indians were given a right in the land,—the right of crossing it to the river,—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States and its grantees as well as against the state and its grantees."

In 1888, by agreement with the Indians, the United States set aside Fort Belknap for certain Indian tribes in Montana, one year prior to the admission of Montana as a state. An irrigation system was con-

structed for the reservation and diverted large quantities of water from Milk River to be used on the reservation. Defendants sought to divert some of the waters from the river above the reservation under the laws of Montana; they contended that when Montana was admitted to the Union the implied rights of the Indians to the water was repealed under the reasoning in the Race Horse case. Again the Supreme Court of the United States rejected such contention and held that by implication under the Agreement of 1888 the waters of Milk River were reserved for irrigation purposes for the benefit of the Indians on the reservation and that ceding of all the lands except a small tract set apart as a reservation was not repealed by the Admission Act. Winters v. United States, supra.

In the case of Seufert Bros. Co. v. United States, supra, a controversy again arose out of the Stevens Treaty of 1855. The Yakimas' land was on the north side of the Columbia River but they sought the right to fish on both the north and south banks thereof. The right was resisted primarily on the ground that allowing them to fish on the south bank of the river would permit them to fish at other than the usual and accustomed places provided for in the treaty.

The Supreme Court rejected such contentions thusly [249 U.S. 194, 39 S.Ct. 205]:

"The suggestion, so impressively urged, that this construction 'imposes a servitude upon the Oregon soil,' is not alarming from the point of view of the public, and private owners not only had notice of these Indian customary rights by the reservation of them in the treaty, but the 'servitude' is one existing only where there was an habitual and customary use of the premises, which must have been so open and notorious during a considerable portion of each year, that any person, not negligently or willfully blind to the conditions of the property he was purchasing, must have known of them.

*     *     *     *     *     *

"To restrain the Yakima Indians to fishing on the north side and shore of the river would greatly restrict the comprehensive language of the treaty, which gives them the right 'of taking fish at all usual and accustomed places and of erecting temporary buildings for curing them,' and would substitute for the natural meaning of the expression used—for the meaning which it is proved the Indians, for more than fifty years derived from it—the artificial meaning which might be given to it by the law and by lawyers."

This decision would indicate that the doctrine set forth in the Race Horse case and subsequently in the case of Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166, each authored by Justice White, was repudiated.

It follows that whatever the original scope of the reserved rights set forth in the

Treaty of 1855 may be, they still exist unimpaired by subsequent agreement, treaty, Act of Congress or the admission of Idaho to statehood.

▮ Because of the divergent views taken in respect to the construction, meaning, scope and import of Article 3 of the Treaty of 1855, it is essential to ascertain its meaning in so far as it relates to the reserved right or privilege of hunting. In respect to this matter recourse may be had to the negotiations between the Indian tribes and the United States government relative to the subject matter and the practical construction and intent. Nielsen v. Johnson, 279 U.S. 47, 49 S.Ct. 223, 73 L.Ed. 607.

An examination of the original proceedings at the Council of Walla Walla Valley reveals that Pe-at-tan-at-tee-miner, in speaking before the Council, had this interesting statement to make:

"I shall do you no wrong and you do me none, both our rights shall be protected forever; it is not for ourselves here that we are talking, it is for those that come that we are speaking. This is all I have to say at this present time."

Governor Stevens, speaking before the Council, said:

"You will be allowed to pasture your animals on land not claimed or occupied by settlers, white men. * * * You will be allowed to go to the usual fishing places and fish in common with the whites, and to get roots and berries and to kill game on land not occupied by the whites; all this outside the Reservation."

Governor Stevens also stated, when addressing himself to Looking Glass, one of the spokesmen of the Indians, as follows:

"I will ask of Looking Glass whether he has been told of our council. Looking Glass knows that in this reservation settlers cannot go, that he can graze his cattle outside of the reservation on lands not claimed by settlers, that he can catch fish at any of the fishing stations, that he can kill game and go to buffalo when he pleases, that he can get roots and berries on any of the lands not occupied by settlers."

▮ It will at once become apparent that the meaning of "open and unclaimed land", as employed in the treaty, becomes more meaningful. It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership and was not intended to nor did it exclude lands title to which rested in the federal government, hence the National Forest Reserve upon which the game in question was killed was "open and unclaimed land."

If the right exists in the State to regulate the killing of game upon open and unclaimed lands ceded by the Nez Perce Indians to the United States, it follows

that such right is to be exercised under the police power of this state. Generally stated, the police power under the American constitutional system has been left to the states. It has been considered a power inherent in and always belonging to the states and not a power surrendered by the respective states to the federal government or by the federal government restricted under the United States Constitution. It is under this further general proposition that the State claims its source and scope of power to prohibit killing deer during certain times of the year in the interests of conservation of wild life. That the State has and may exercise such power generally is not the question; this power is limited in the enactment of laws and regulations to the extent that the same are not repugnant to any constitutional provisions of either the State or the Federal Constitution. Is the law and regulation as to a closed season repugnant to rights reserved under the Treaty of 1855?

The Constitution of the United States does not contain any provisions which expressly limit the police power of any state; however, it does forbid the exercise of certain powers by the state under Art. 1, § 10, of the Federal Constitution, including the inhibition against any state passing any laws impairing the obligation of contracts; moreover, Art. 6, cl. 2 of the Federal Constitution expressly declares that the Federal Constitution and the laws of the United States made in pursuance thereof, and all treaties made, or which shall be made, shall be the supreme law of the land, binding upon the judges in every state notwithstanding anything in the Constitution or laws of any state to the contrary. Hence the federal government is paramount and supreme within the scope of powers conferred upon it by the Constitution and it follows that a state must exercise its police power subject to constitutional limitations, if any; the statute of any state enacted pursuant to its police power which conflicts with any treaty of the United States constitutes an interference with matters that are within the exclusive scope of federal power and, hence, cannot be permitted to stand. 16 C.J.S., Constitutional Law, § 196, page 565; the treaty being superior to a particular state law and regulation, though the state law and regulation involved is otherwise within the legislative power of the state, the rights created under the treaty cannot thus be destroyed; this in effect holds the application of the statute in abeyance during the existence of the obligation of the treaty. 63 C.J., § 29, pp. 844–45. This recognizes the principle that the provisions of the United States Constitution shall elevate treaties of the federal government over state legislation though the state legislation appertains to the state police power. 11 Am.Jur., § 255, p. 987.

In the case of Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115, decided in 1942, a member of the Yakima tribe by the name of Tulee was convicted

in the state court of Washington on the charge of catching salmon with a net and without a license required by the statutes of Washington. Tulee claimed that he had the right to fish without a license under the Treaty of 1855. The State of Washington admitted that the enabling act preserved the rights of the Indians but in reliance upon its inherent police powers to conserve fish and game within its borders claimed the right to regulate fishing in the area in question although within the territory originally ceded by the Yakimas but outside of their reservation. The State urged application of the holding in both the Race Horse case and the Kennedy-Becker case. Both were rejected by the United States Supreme Court which relied upon the decisions in the Winans case and the Seufert Bros. Co. case and held that the exaction of a license fee as a prerequisite to the enjoyment of fishing in the usual and accustomed places was in conflict with and could not be reconciled with a fair construction of the language of the treaty and hence the statute exacting such fee was invalid. While there is an inference in the Tulee case that the State may have the power to enact reasonable regulations concerning the time and manner of fishing outside the reservation, such inference was in the nature of dictum as it was only necessary for the Supreme Court of the United States to decide whether the State of Washington could exact a license for fishing. In holding that the State could not so exact the license fee the reasoning was that such an exaction would be a charge on the Indians for exercising the very right their ancestors intended to reserve and that to sanction such an exaction would be entirely out of harmony and could not be reconciled with any fair construction of the treaty. This case can stand for no more than the proposition that the Yakimas under the Treaty of 1855 could not be burdened with the license requirements under the state game laws primarily enacted in the interest of wild life conservation.

This court has had occasion to pass upon this same question as it applied to the Nez Perce Indians under this same treaty and held therein under the authority of the Tulee case that the State has no right to require a fishing license from a member of the Nez Perce tribe. State v. McConville, 65 Idaho 46, 139 P.2d 485. In this case no other question of regulation under any conservation program of this state was considered or passed upon.

We are not here concerned with the general right vested in the State under its police power to enact reasonable laws for the conservation of wild life; this right has long been recognized and whenever it can be done without violating any organic act of the land or without invasion of rights protected by constitution or treaty, it is recognized. The question here is whether or not the pre-existing ancient Indian hunting rights which were reserved to them in the Treaty of 1855 may have attached

to such rights the exercise of the police power of the State. It is primarily a question of whether or not the police power here sought to be invoked by the State ever has attached to or can apply to such rights without the consent of such Indians or by positive act on the part of the federal government extinguishing the right which was reserved in the Indians and thus far has never passed from them to the people, to the state, or to the nation.

One of the primary purposes of licensing in reference to fishing and hunting is to conserve wild life; the law is essentially a regulatory act rather than a revenue act. To exact a license under the claimed police power, which the Supreme Court of the United States held could not be done in the case of Tulee v. Washington, supra, and which the Supreme Court of Idaho held could not be done in the case of State v. McConville, supra, certainly would be less onerous upon the affected Indian tribes than the enactment of legislation under the claimed police power limiting the killing of game or prohibiting fishing in certain areas or doing either during certain times of the year. While both fishing and hunting are primarily sport and recreation for most fishermen and hunters, this is not so with respect to the Indians; they have always fished and hunted to obtain food and furs necessary for their existence and have been controlled as to the time when and the area where and the amount of catch or kill by the exigencies of the occasion; while no doubt this was more so in 1855 than it is now, the fact remains that it is to a lesser extent also true today; be that as it may, their rights reserved in this respect should be determined in the light of conditions existing at the time of the treaty and the manifest intent of all contracting parties at that time. Under the holding of the Tulee and McConville cases the Supreme Court of the United States in the first case and the Supreme Court of this state in the second case have definitely held that to exact a license fee from the Indians in order to fish, and I assume the same would be true with reference to hunting, could not be reconciled with the rights reserved under the treaty. The decision in each case was not premised on burden but upon principle; surely the exaction of a $2 fishing license would not unduly burden an Indian who desires to fish nor would it likely cause him to forego this reserved right. His rights of an equal, if not of a superior nature under the treaty to hunt upon open and unclaimed lands, because less restricted by the language of the treaty should upon principle and fair dealing be protected against state laws which limit him to hunt at certain times of the year in common with all other citizens. This would mean that at certain times of the year his otherwise ancient right recognized by the treaty and never extinguished would for all practical purposes be extinguished. If the position of the State is sustained the

assurance given by Governor Stevens that they could kill game when they pleased and the provision of the treaty reserving to them the right to hunt upon open and unclaimed lands is no right at all. Out of the solemn obligations of the treaty, and the express reserved property right which never passed from the Indians to anyone and which the federal government has never extinguished but has expressly recognized before and after Idaho was admitted to the Union, the Nez Perce would now have no right in any respect different than that enjoyed by all others, except perhaps the freedom from the burden of a license fee. This was never intended under the broad, fair and liberal construction of the treaty. The Supreme Court of the United States has recognized and expressly held that the Indian treaty fishing provisions accorded to them rights which do not exist for other citizens. Tulee v. Washington, supra; Seufert Bros. Co. v. United States, supra; United States v. Winans, supra. What are such rights under the State's theory? Perhaps to hunt without a license. If such rights exist as to fishing most assuredly they exist as to hunting. If the State can regulate the time of year in which they may hunt then they are accorded no greater rights in this respect than exist for other citizens.

We are not here concerned with the wisdom of the provisions of the treaty under present conditions nor with the advisability of imposing upon the Indians certain regulatory obligations in the interest of conserving wild life; that is for the Federal Government, the affected tribe, and perhaps the State of Idaho to resolve under appropriate negotiations; our concern here is only with reference to protecting the rights of the Indians which they reserved under the Treaty of 1855 to hunt upon open and unclaimed land without limitation, restriction or burden.

We hold that the rights reserved by the Nez Perce Indians in 1855, which have never passed from them, to hunt upon open and unclaimed land still exist unimpaired and that they are entitled to hunt at any time of the year in any of the lands ceded to the federal government though such lands are outside the boundary of their reservation. It necessarily follows that the judgment below should be and the same is hereby affirmed.

PORTER, C. J., and GIVENS, TAYLOR and KEETON, JJ., concur.