STATE, Respondent v. McCLURE et al., Appellants.
Combined Appeal
Nos. 9346, 9347
Submitted December 29, 1953. Decided March 29, 1954.

Mr. Justice Angstman dissented.

Raymond F. Gray, and Robert H. Wilson both of Ronan for appellants.

Arnold H. Olsen, Attorney General, Vera Jean Heckathorn, Assistant Attorney General, A. L. Libra, County Attorney, Eugene H. Mahoney, Special Assistant Attorney General of Thompson Falls for respondent.

Mr. Gray, Mr. Wilson and Mr. Mahoney argued orally.

MR. JUSTICE BOTTOMLY:

This is an appeal from a judgment of conviction and fine from the district court of Sanders County.

The defendants were first arrested by an Indian policeman January 24, 1952, taken before the tribal council and there accused and found guilty by the judge of the Flathead Indian Reservation tribal court of violating their ordinance 9-A, killing antelope on the reservation during the closed season, each defendant being fined, the fine paid and they were released. Defendants were then arrested March 12, 1952, and taken before justice of the peace James L. Adams, Sanders County, on complaint that defendants had in their possession an antelope which

was killed during the closed season for hunting antelope under state law. They were each found guilty of having possession of the same antelope that they had been fined for killing by the tribal council and each fined $100. Defendants appealed to the district court of Sanders County. A jury being waived, the issues were tried to the judge without a jury. After trial the judge found each defendant guilty as charged in the complaints and fined each defendant $150. This appeal is from the judgment filed December 11, 1952, and the order assessing fine of January 26, 1953.

Defendants Lindy McClure and Jim Carpentier are Indians and enrolled members of the Flathead Tribe and wards of our Federal Government. Their cases were consolidated for trial in the district court and upon argument here. They are each charged with the same alleged offense, and the law and facts applicable are the same.

The Indians of the Flathead reservation elected to and did come under the Wheeler-Howard Act of June 18, 1934, 48 Stat. 984, 25 U. S. C. A. sec. 461 et seq. It was stipulated by the state that the Indian tribes of the Flathead reservation had complied with the federal regulations and laws; that they are duly organized and have the authority to pass ordinances to conduct their internal affairs in pursuance of the Wheeler-Howard Act.

The witness James J. Swaney testified, interalia, that he resided at the Flathead Indian Agency at Dixon; that he was the secretary-treasurer of the tribal council; that he knew the procedure of said council; that the tribal council of the Flathead Indian Reservation received a charter from the Secretary of Interior and thereunder adopted a constitution and by-laws; that under such charter tribal courts were set up on the Flathead Indian Reservation; that they have two judges, all under the authority of federal law.

The council on March 1, 1951, passed ordinance No. 9-A, which was approved the same date. Said ordinance provided as far as pertinent here as follows:

"Ordinance
of the Governing Body of
The Confederated Salish
& Kootenai Tribes
of the Flathead Reservation
An Indian Chartered Corporation

"Be It Enacted by the Council of the Confederated Salish & Kootenai Tribes of the Flathead Reservation that:

"1. We are hereby closing the entire reservation to hunting and killing of antelope.

"2. Both Tribal and State Game Wardens shall have authority to arrest anyone violating this ordinance and to bring them to the proper courts for punishment.

"3. This closure shall remain in effect until such time as it is mutually agreed by the Tribal Council and the State Game Commission to have an open season.

"4. At the time of any open season the permits shall be equally divided between the Indians and white people.

"Certificate

"The foregoing ordinance was on February 23, 1951, duly adopted by a vote of 9 for and 1 not voting, by the Tribal Council of the Confederated Salish & Kootenai Tribes of the Flathead Reservation, in accordance with Section 1(a), (N), Art. VI of the constitution of the Tribes, ratified by the Tribes on October 4, 1935, and approved by the Secretary of the Interior on October 28, 1935, pursuant to Sec. 16 of the Act of June 18, 1934 (48 Stat. 984).

> "(Signed) Walter H. Morigeau
> "Chairman, Tribal Council

> "Attest:

>> "(Signed) Phil Hamel
>> "Secretary, Tribal Council

"Approved March 1, 1951
"(Signed) C. C. Wright
"Superintendent, Flathead Agency"

James J. Swaney, secretary-treasurer of the tribal council,

testified: "Q. Now go back to this agreement that was talked about here. As secretary of the tribe, would you know if there was an agreement between the Fish and Game Commission and the Flathead tribe regarding antelope on the Flathead reservation? A. That was brought up in a council meeting at one time, and there never was an agreement between the State Fish and Game Commission and the Flathead tribe to plant the antelope within the boundaries of the reservation. Q. So what actually happened, they just put them here? A. Apparently so, because I have never seen an agreement of any kind."

At the close of the testimony in the district court defendants moved the court for an order of dismissal for the reason that the State of Montana did not have jurisdiction, and asserting the rights of defendants under the treaty of July 16, 1855.

The court, January 26, 1953, after finding each of the defendants guilty as charged in each complaint, then entered the following order: "It was thereupon ordered by the court that the above defendants, Lindy McClure and Jim Carpentier each pay a fine in the amount of $150.00, and if said fine is not paid same to be served in the county jail at the rate of one day for each two dollars of said fine." Defendants were thereupon remanded to the custody of the sheriff until said fine was paid. The court on the same day, January 26, 1953, made the further order as follows: "At this time it is ordered that money on deposit as bonds of defendants in the sum of $100.00 each, be applied toward payment of the fine of defendants, said fine being in the amount of $150.00 each, and that defendants have three days from this date within which to pay the balance of said fines, monies so paid to be held by the clerk of this court as bond or undertaking pending appeal to Supreme Court."

From the judgment and orders fining defendants, this appeal was perfected.

It was stipulated that the game animals, to wit, the antelope, were killed on patented and fee land and within the exterior boundaries of the Flathead Indian Reservation.

Defendants base their defense upon the terms of the treaty

of July 16, 1855. This treaty was one of a group of eleven treaties negotiated with the Indian nations and tribes of the northwest between December 26, 1854, and July 16, 1855. Most of the treaties were with coast Indians of the territories of Washington and Oregon, and with those Indians the prime consideration was in protecting and reserving their fishing rights and grounds which provided their major food supply. However, the Flathead and other prairie Indian nations' primary interest was to protect and reserve their hunting rights and grounds which provided their major food and clothing. The form of the treaty, however, was almost identical in each instance.

The question presented here on this appeal is whether the defendants, as members of the Flathead Indian Reservation, with a superintendent thereof in charge, and being wards of our Federal Government, were, as far as state law is concerned, entitled to hunt, kill and take and possess game animals during the closed season on a parcel of land lying wholly within the exterior boundaries of the Flathead Indian Reservation, said parcel of land being patented in fee by the Federal Government.

There is no substantial dispute of facts, or none that is important to our inquiry.

The negotiations and proceedings and council held by Governor Stevens representing the President of the United States, and the Chiefs of the Flathead, Pend d'Oreille and Kootenai tribes, were held at Hell Gate in the Bitterroot Valley, Washington Territory, commencing July 7th and concluded July 16, 1855. This treaty with the Flathead Nation was ratified by the Senate of the United States March 8, 1859, and proclaimed by President James Buchanan April 18, 1859, 12 Stat. 975, 979. By this treaty the Flathead Indian Reservation was established and has continuously so existed under the direction of the superintendent thereof to this date.

Such a treaty solemnly entered into is a contract between two independent nations, in this case, the United States of America and the Flathead Nation, and such a treaty is regarded as a part of the law of the state as much as the state's own laws and

Constitution and is effective and binding on state legislatures. Such a treaty is superior to the reserved powers of the state, including the police power. 63 C. J., Treaties, secs. 27, 28, 29, pp. 844, 845. Compare State of Missouri v. Holland, 252 U. S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984, and cases therein cited; State v. Arthur, 74 Idaho 251, 261 Pac. (2d) 135.

The above treaty of July 16, 1855, contained the following, after describing the boundaries of the Flathead reservation, ''All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the *exclusive use and benefit* of said confederated tribes as an Indian reservation. Nor shall any white man, excepting those in the employment of the Indian department, be permitted to reside upon said reservation without permission of the confederated tribes, and the superintendent and agent.'' (Italics supplied.)

Article 3 thereof provides, as far as pertinent here: ''The *exclusive* right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.'' It should be borne in mind that this treaty with the Flathead Nation was not a grant of rights from our government to the Indians but it was a grant by the Indians of a vast domain to our government, reserving to them all they did not cede and grant.

At the time this treaty of 1855 was entered into, these Indians were in possession of and claimed all the lands that were ceded by the treaty as well as all the lands reserved. They had always exercised their right to hunt and fish thereon from time immemorial. It was their ancestral home. The treaty confirmed their ownership and their rights. The treaty acknowledged the same and by the treaty our Federal Government guaranteed this ancient and exclusive right to hunt and take game and fish within the exterior boundaries of their reservation which they

had always exercised. The treaty then went further and acknowledged and assured the Indians the right to fish at all usual and accustomed places outside the reservation in common with citizens of the Territory. Also assured was the Indians' right to hunt and take game outside the reservation on all open and unclaimed lands. These rights have never passed from the Indians to the people generally, nor to the state nor to the Federal Government.

This same provision in a similar treaty in regard to Indians' fishing rights *outside* their reservation was considered in United States v. Winans, 198 U. S. 371, 25 S. Ct. 662, 663, 49 L. Ed. 1089, wherein the court interpreted Article 3 of that treaty, being Article 3 quoted above. That suit was brought to enjoin respondents and their predecessors in title from keeping Yakima Indians from white man's lands which the white man claimed under patents of the United States and patents from the State of Washington to the lands bordering on the Columbia River. The court said: ''At the time the treaty was made the fishing places were part of the Indian country, subject to the occupancy of the Indians, with all the rights such occupancy gave. The object of the treaty was to *limit the occupancy to certain lands, and to define rights outside of them.* * * * In other words, it was decided [in the court below] that the Indians acquired no rights but what any inhabitant of the territory or state would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention which seemed to promise more, and give the word of the nation for more. And we have said we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right, without regard to technical rules.' [Choctaw Nation v. U. S.] 119 U. S. 1, 7 S. Ct. 75, 30 L. Ed. 306; [Jones v. Meehan] 175 U. S. 1, 20 S. Ct. 1, 44 L. Ed. 49. * * *

"In other words, the treaty was not a grant of rights to the Indians, but a grant of right from them,—*a reservation of those not granted.* And the form of the instrument and its language was adapted to that purpose. Reservations were not of particular parcels of land, and could not be expressed in deeds, as dealings between private individuals. The reservations were in large areas of territory, and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. *They imposed a servitude upon every piece of land as though described therein. There was an exclusive right of fishing reserved within certain boundaries.* There was a *right outside of those boundaries reserved* 'in common with citizens of the territory.' * * * The contingency of the *future ownership of the lands,* therefore, was foreseen and provided for; in other words, the Indians were given a right in the land,—the right of crossing it to the river,—the right to occupy it to the extent and for the purpose mentioned. * * * *And the right was intended to be continuing against the United States and its grantees as well as against the state and its grantees.* * * *

"The construction of the treaty disposes of certain subsidiary contentions of respondents. *The Land Department could grant no exemptions from its provisions. It makes no difference, therefore, that the patents issued by the Department are absolute in form. They are subject to the treaty as to the other laws of the land.* * * * And surely it was within the competency of the nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.' Nor does it restrain the state unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enable the right to be exercised." Italics supplied. Certainly if these principles apply to lands lying outside the reservation, they apply with greater force to exclusive rights to hunt and take game on all lands within the reservation. The Winans Case is the leading case on this subject and has been cited as authority dozens of times as the citator shows. Compare State v. Arthur, supra.

In Seufert Bros. Co. v. United States, 249 U. S. 194, 39 S. Ct. 203, 205, 63 L. Ed. 555, speaking of fishing rights of the Indians on their ceded lands, the court reaffirmed what was said in the Winans Case, supra, and then stated: ''The suggestion, so impressively urged, that this construction 'imposes a servitude upon the Oregon soil,' is not alarming from the point of view of the public, and private owners * * * had notice of these Indian * * * rights by the reservation of them in the treaty * * *.''

In State v. Tulee, 7 Wash. (2d) 124, 109 Pac. (2d) 280, the defendant, a member of the Yakima Tribe of Indians, was convicted in the superior court on a charge of catching salmon with a net without a license as required by state law. The Supreme Court of Washington affirmed. On appeal the Supreme Court in Tulee v. Washington, 315 U. S. 681, 62 S. Ct. 862, 863, 86 L. Ed. 1115, reversed. The court said: ''* * * the Indians agreed to a treaty, under which they were to cede 16,920 square miles of their territory, reserving 1,233 square miles for the confederated tribes * *.*.'' This agreement was executed June 9, 1855, ratified by the Senate March 8, 1859, and proclaimed by the President April 18, 1859, 12 Stat. 951. This is another of the treaties negotiated by Governor Stevens. The court continues: ''The appellant claims that the Washington statute compelling him to obtain a license in order to fish for salmon violates the following provision of Article III of the treaty:

'' 'The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed lands.'

''*The state does not claim power to regulate fishing by the Indians in their own reservation.* Pioneer Packing Co. v. Winslow, 159 Wash. 655, 294 Pac. 557. Nor does it deny that treaty rights of Indians, whatever their scope, were preserved by Con-

gress in the act which created the Washington Territory and the enabling act which admitted Washington as a state. 10 Stat. 172; 25 Stat. 676." Italics supplied. Compare United States v. Romaine, 9 Cir., 255 F. 253. Here it should be pointed out that the same Enabling Act applies to Montana.

The appellants in the Tulee Case argued that the treaty gives them an unrestricted right to fish in the usual and accustomed places free from state regulations of any kind. The court continues: "In determining the scope of the reserved rights of hunting and fishing, we must not give the treaty the narrowest construction it will bear. In United States v. Winans, 198 U. S. 371, 25 S. Ct. 662, 664, 49 L. Ed. 1089, this Court held that, despite the phrase 'in common with citizens of the territory,' Article III conferred upon the Yakimas continuing rights, beyond those which other citizens may enjoy, to fish at their 'usual and accustomed places' in the ceded area; and in Seufert Bros. Co. v. United States, 249 U. S. 194, 39 S. Ct. 203, 63 L. Ed. 555, a similar conclusion was reached even with respect to *places outside the ceded area.* * * * It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. United States v. Kagama, 118 U. S. 375, 384, 6 S. Ct. 1109, 1114, 30 L. Ed. 228; Seufert Bros. Co. v. United States, supra, 249 U. S. pages 198, 199, 39 S. Ct. page 205.

"Viewing the treaty in this light we are of the opinion that the state is without power to charge the Yakimas a fee for fishing. * * * Even though this method may be both convenient and, in its general impact fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve. * * * We therefore hold the state statute invalid as applied in this case." Emphasis supplied. Compare Anthony v. Veatch, 189 Or. 462, 220 Pac. (2d) 493, 502, 503, 221 Pac. (2d) 575; 27 Am. Jur., Indians, secs. 9 & 10, pp. 547, 548; 52 Am. Jur.,

Treaties, secs. 25-40, pp. 821-829; 63 C. J. Treaties, sec. 22, p. 841; State v. Arthur, supra.

There is no question here challenging the sovereign power and right of the state under its police power to enact all needful laws to protect and conserve for use our wild life. Everyone of us desires the conservation for use of all natural resources. There is no question but what the state has such general power. Here, however, we have rights reserved under the treaty of July 16, 1855, to these Indians, which treaty rights have never been altered or changed and are as valid today as when written, and are continuing until by mutual consent are abrogated in a lawful manner by the Indians and our Federal Government. Under the Constitution this treaty is a part of the supreme law of the land and the obligations thereunder can be released only by the concurrence of both parties thereto. Compare United States v. City of Salamanca, D. C., 27 F. Supp. 541; Peters v. Malin, C. C., 111 F. 244.

Our own legislature by the preamble of Chapter 198, Laws of 1947, recognized the treaty rights as fully existing, wherein they solemnly recited: ''Whereas, by treaty of July 16, 1855, between the United States of America, represented by Isaac I. Stephens [Stevens], governor and superintendent of Indian Affairs for the Territory of Washington, and the chiefs, headmen and delegates of the confederated tribes of the Flathead, Kootenai and Upper Pend d'Oreille Indians, the said Indians were given the exclusive right to fish and hunt on the Flathead Indian reservation, and the privilege of hunting in their usual hunting grounds on large areas of Montana * * *.'' Chapter 198, Laws of 1947, grants nothing to the Indians but what they already had under the treaty of July 16, 1855.

In Gains v. Nicholson, 9 How. 356, 50 U. S. 356, 364, 13 L. Ed. 172, the court said of the Indians' rights in an Indian reservation, that ''He holds, strictly speaking, not under the treaty of cession, but under his original title, confirmed by the government in the act of agreeing to the reservation.''

It is primary law that the treaties with Indians are to be,

and always have been, liberally construed, to the end that Indians will retain the benefits conferred by the treaty at the time of its execution and as the Indians understood them. United States v. Winans, supra. In this connection it is well to examine the original proceedings at the Hell Gate council which reveals Governor Stevens in answer to the Indians about their reservations, in council stated: "This treaty provides not only that no white man shall go on your land, but that no trader shall continue there without your consent. The whole of the land will be yours. * * * You have in like manner the right to gather roots and berries, to take fish and kill game." Article XII of the Treaty provides: "This treaty shall be obligatory upon the contracting parties as soon as the same shall be ratified by the President and Senate of the United States."

The exclusive right to hunt and fish, under the treaty, on all of the lands within the exterior boundaries of the Flathead Indian Reservation was not granted by the United States but was reserved by the Indians. It is a right held in common by each Indian of the tribes signatory to the agreement. This right is a servitude and easement, an interest in the land, which the Indians have never alienated and which interest and right the United States or the state never owned or acquired and therefore could not convey. No patent issued by the government, either federal or state, conveyed this right and interest. U. S. v. Winans, supra. In the patents so issued there was no exclusion of this servitude, nor the treaty amended to permit such exclusion. The lands of this reservation and any interest therein not alienated is a trust held for each Indian in common. These lands and interests therein were not held by the United States for the state upon its admission. Compare: United States v. Stotts, D. C., 49 F. (2d) 619; United States v. Winans, supra; R. C. M. 1947, secs. 67-601, 67-602.

The Flathead Indian Reservation has its own tribal council courts for the purpose of adjudicating the controversies of minor nature arising through the infraction of their own ordinances. The Federal Government has always recognized the

Indians' right to have their own laws and courts to deal with their own minor infractions and internal affairs of their tribes. It has given the Indians the means of learning systematic methods of keeping the peace among their own people and enforcing their own regulations and ordinances, which is a healthy and democratic home rule procedure, with which the Federal Government does not interfere and the state may not, in a case such as we have here. This self-government in regard to their own internal minor affairs harks back to the explanation of the treaty of July 16, 1855, at the council of which Governor Stevens explained to them that: "On another point I wish to speak plainly; within yourselves you will be governed by your own laws. You will respect the laws which govern the white man and the white man will respect your laws. Your own laws that you will manage yourselves. * * * I think you understand the different points of the treaties."

Congress has prescribed what acts should constitute crimes when committed by Tribal Indians, wards of the government, within the exterior boundaries of a regularly constituted Indian reservation and the courts in which they shall be tried, providing that the exclusive jurisdiction thereof is in the federal courts. State ex rel. Irvine v. District Court, 125 Mont. 398, 239 Pac. (2d) 272; In re Blackbird, D. C., 109 F. 139; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; State v. Arthur, supra; United States ex rel. Lynn v. Hamilton, D. C., 233 F. 685. All other violations by such Indians are left to the tribal courts.

The exclusive right, acknowledged by the treaty, of hunting and fishing in and upon the lands and waters within the exterior boundaries of the Flathead Indian Reservation, imposed a servitude and easement upon every piece of land therein as though specifically described. The future ownership of the lands thereof was well foreseen and provided for.

The Indians retained a right in the land, the right of hunting thereon. The right was intended to be a continuing one against the United States and its grantees as well as against the state and its grantees. No other conclusion would give effect to

the treaty. Compare United States v. Winans, supra. It is our opinion that the rights reserved of hunting and fishing upon any and all lands and waters within the exterior boundaries of the Flathead Indian Reservation, by the treaty of July 16, 1855, 12 Stat. 975, have never been alienated, still exist unimpaired and that as far as the state laws are concerned, the Indian tribes bound by the treaty are enittled to hunt and fish therein at any time. The only restriction thereon is the ordinances and laws of their own council and the laws of the United States.

We therefore hold that the justice court and the district court were without jurisdiction to try the defendant Indians for the alleged offense for which they were here accused and convicted; that under the undisputed facts the court's purported judgment is a nullity. Accordingly the judgment of conviction and the sentences imposed are reversed and set aside as void. The complaints are ordered dismissed with prejudice. It is further ordered that any fine collected from defendants be repaid to them and that their bail and undertaking be exonerated.

MR. JUSTICE FREEBOURN, concurs.

MR. CHIEF JUSTICE ADAIR: (specially concurring).

I concur in the result but not in all that is said in the foregoing opinion.

MR. JUSTICE ANDERSON:

Without agreeing to the reasons expressed in the majority opinion, I nonetheless subscribe to the result reversing the conviction. No useful purpose would be served by expressing my thoughts on the matter and I thus reserve them.

MR. JUSTICE ANGSTMAN: (dissenting).

I find myself in disagreement with the foregoing opinion. I think the trial court was correct in its decision.

I concede that treaties with the Indians should be interpreted as "that unlettered people" understood them. Doubts should be resolved in favor of the Indians. Their rights exist not by virtue of a grant from the government but because they were

reserved to them. So viewing the treaty of July 16, 1855, I do not find in it any reservation of an exclusive right in the Indians to hunt as held in the majority opinion, nor do I think the Indians as a whole think so. That is why the tribal council passed the ordinance referred to in the majority opinion.

Article 3 of the treaty is the one involved here. It provides: "The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accuscustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." 12 Stat. 975.

The word "exclusive" qualifies only the first sentence in the section. The second sentence expressly negatives any exclusive right in the Indians because it reserves only the right "in common with the citizens of the Territory." The third sentence does not revive the word "exclusive" as used in the first sentence. Under no possible construction of the third sentence of Article 3 were the hunting rights ever intended to be exclusive. It simply reserved the right of hunting upon "open and unclaimed land."

The land in question here was not open and unclaimed land. It was land to which a patent in fee had been given by the federal government.

Under section 4 of the Enabling Act, in speaking of Indian lands, it is provided that "until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States * * *." Ordinance 1, paragraph second of the constitution contains the same provision. Vol. 1, R. C. M. 1947, p. 293.

After title to the land has been extinguished the federal jurisdiction ceases and jurisdiction vests in the state. The rule

applicable here was stated in State v. Big Sheep, 75 Mont. 219, 243 Pac. 1067, 1071, as follows: "If defendant is a ward of the government, and the act was committed by him upon land to which the United States has relinquished title, the state has jurisdiction * * *. We conclude, therefore, that, if the defendant * * * committed the offense upon land to which the United States has relinquished title, he is subject to the jurisdiction of the courts of this state for the offense committed; otherwise he is not."

Most of the cases cited and relied on in the majority opinion are cases involving the right to fish and pertain to a different clause in the treaty from the one we are considering here. They were considering the clause giving the Indians the reserved right to fish at all "usual and accustomed places". That is quite different from the provision before us reserving the right to hunt on all "open and unclaimed land." But even in case of fishing rights under the second sentence of paragraph 3 of the treaty the courts concede the right of the state to place reasonable regulations regarding the time of fishing.

. In the case of United States v. Winans, 198 U. S. 371, 25 S. Ct. 662, 665, 49 L. Ed. 1089, the principal case relied on, the court was careful to point out that the treaty permitted reasonable state regulation. The court on that point said: "Nor does it restrain the state unreasonably, if at all, in the regulation of the right."

And in Tulee v. Washington, 315 U. S. 681, 62 S. Ct. 862, 864, 86 L. Ed. 1115, the court had before it the question of the right of the state of Washington to impose a license fee upon Indians for the privilege of catching fish in usual and accustomed places at a point outside the reservation but which was within the territory originally ceded by the Indians. The court stated: "We think the state's construction of the treaty is too narrow and the appellant's too broad; that while the treaty leaves the state with power to impose on Indians equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for

the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here.''

But whatever the rule may be as to fishing rights, it is clear that Article 3 of the treaty does not reserve hunting rights on patented land.

My associates place reliance on the case of State v. Arthur, 74 Idaho 251, 261 Pac. (2d) 135, 141, which dealt with a treaty identical with Article 3 of the treaty we are considering so far as hunting rights are concerned. The defendant was there charged with killing a deer out of season on National Forest land, outside the boundaries of the Indian reservation but within the exterior boundaries of lands ceded to the federal government by the Indian tribe. The court held that defendant had the right to hunt and kill deer on the lands in question. It reached this conclusion because the land where the deer was killed was '' 'open and unclaimed land' '' within the meaning of the treaty. The court on this point said: ''It will at once become apparent that the meaning of 'open and unclaimed land', as employed in the treaty, becomes more meaningful. It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership and was not intended to nor did it exclude lands title to which rested in the federal government, hence the National Forest Reserve upon which the game in question was killed was 'open and unclaimed land.' ''

Since the land where the antelope was killed by defendant here was not ''open and unclaimed land'' that case is not applicable here.

I do not attach much importance to Chapter 198, Laws of 1947, so far as this case is concerned. The preamble recites that the treaty of July 16, 1855, gave to the Indians the exclusive right to fish and hunt on the Flathead Indian reservation, and the privilege of hunting in their usual hunting grounds on large areas of Montana. There is nothing in the treaty of July 16, 1855, which justifies such a statement. Obviously the preamble to the bill, or even the bill itself, could not alter the treaty pro-

vision. The general rule is that the preamble to a bill is not an essential part of it and that it neither enlarges nor confers powers. Portland Van & Storage Co. v. Hoss, 139 Or. 434, 9 Pac. (2d) 122, 81 A. L. R. 1136.

Whether the tribal court had jurisdiction to impose a fine upon defendant for violating the tribal ordinance is not before us in this action. The only question here is did the lower court have jurisdiction to do what it did. I think it did. Though perhaps not material it is noteworthy that the only evidence in the record indicates that the tribal court proceeded with the proceedings after the defendant was arrested in the state court.

I may say in passing that in my opinion this case is not comparable to a case where the laws of more than one sovereignty have been violated. Here either the tribal courts or the state courts had jurisdiction. Both cannot have jurisdiction over the same offense committed at the same place. It is my view that the state court had jurisdiction and that the tribal court did not have jurisdiction. The double penalty is improper but relief in my opinion should come from the tribal court which did not have jurisdiction.

I think the district court was right and that the judgment should be affirmed.