3/29/2019 11:35:21 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **16-1498.pdf** | versus | **16-1498_new.pdf** |
| **49 pages (226 KB)** | | **49 pages (236 KB)** |
| 3/19/2019 9:17:55 AM | | 3/29/2019 11:28:08 AM |

**Total Changes**

**48**

**Content**

12 Replacements

36 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 5)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WASHINGTON STATE DEPARTMENT OF LICENSING *v.* COUGAR DEN, INC.

### CERTIORARI TO THE SUPREME COURT OF WASHINGTON

No. 16–1498. Argued October 30, 2018—Decided March 19, 2019

The State of Washington taxes "motor vehicle fuel importer[s]" who bring large quantities of fuel into the State by "ground transportation." Wash. Rev. Code §§82.36.010(4), (12), (16). Respondent Cougar Den, Inc., a wholesale fuel importer owned by a member of the Yakama Nation, imports fuel from Oregon over Washington's public highways to the Yakama Reservation to sell to Yakama-owned retail gas stations located within the reservation. In 2013, the Washington State Department of Licensing assessed Cougar Den $3.6 million in taxes, penalties, and licensing fees for importing motor vehicle fuel into the State. Cougar Den appealed, arguing that the Washington tax, as applied to its activities, is pre-empted by an 1855 treaty between the United States and the Yakama Nation that, among other things, reserves the Yakamas' "right, in common with citizens of the United States, to travel upon all public highways," 12 Stat. 953. A Washington Superior Court held that the tax was pre-empted, and the Washington Supreme Court affirmed.

*Held*: The judgment is affirmed.

188 Wash. 2d 55, 392 P. 3d 1014, affirmed.

JUSTICE BREYER, joined by JUSTICE SOTOMAYOR and JUSTICE KAGAN, concluded that the 1855 treaty between the United States and the Yakama Nation pre-empts the State of Washington's fuel tax as applied to Cougar Den's importation of fuel by public highway. Pp. 4–18.

(a) The Washington statute at issue here taxes the importation of fuel by public highway. The Washington Supreme Court construed the statute that way in the decision below. That court wrote that the statute "taxes the importation of fuel, which is the transportation of

fuel." 188 Wash. 2d 55, 69, 392 P. 3d 1014, 1020. It added that "travel on public highways is directly at issue because the tax [is] an importation tax." *Id.*, at 67, 392 P. 3d, at 1019. The incidence of a tax is a question of state law, *Oklahoma Tax Comm'n* v. *Chickasaw Nation*, 515 U. S. 450, 461, and this Court is bound by the Washington Supreme Court's interpretation of Washington law, *Johnson* v. *United States*, 559 U. S. 133, 138. Nor is there any reason to doubt that the Washington Supreme Court meant what it said when it interpreted the statute. In the statute's own words, Washington "impose[s] upon motor vehicle fuel licensees," including "licensed importer[s]," a tax for "each gallon of motor vehicle fuel" that "enters into this state," but only "if . . . entry is" by means of "a railcar, trailer, truck, or other equipment suitable for ground transportation." Wash. Rev. Code §§82.36.010(4), 82.36.020(1), (2), 82.36.026(3). Thus, Cougar Den owed the tax because Cougar Den traveled with fuel by public highway. See App. 10a–26a; App. to Pet. for Cert. 55a. Pp. 4–10.

(b) The State of Washington's application of the tax to Cougar Den's importation of fuel is pre-empted by the Yakama Nation's reservation of "the right, in common with citizens of the United States, to travel upon all public highways." This conclusion rests upon three considerations taken together. First, this Court has considered this treaty four times previously; each time it has considered language very similar to the language now before the Court; and each time it has stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855. See *United States* v. *Winans*, 198 U. S. 371, 380–381; *Seufert Brothers Co.* v. *United States*, 249 U. S. 194, 196–198; *Tulee* v. *Washington*, 315 U. S. 681, 683–685; *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 677–678. Thus, although the words "in common with" on their face could be read to permit application to the Yakamas of general legislation (like the legislation at issue here) that applies to all citizens, this Court has refused to read "in common with" in this way because that is not what the Yakamas understood the words to mean in 1855. See *Winans*, 198 U. S., at 379, 381; *Seufert Brothers*, 249 U. S., at 198–199; *Tulee*, 315 U. S., at 684; *Fishing Vessel*, 443 U. S., at 679, 684–685. Second, the historical record adopted by the agency and the courts below indicates that the treaty negotiations and the United States' representatives' statements to the Yakamas would have led the Yakamas to understand that the treaty's protection of the right to travel on the public highways included the right to travel with goods for purposes of trade. Third, to impose a tax upon traveling with certain goods burdens that travel. And the right to travel on the public highways without such burdens is just what the treaty protects. Therefore,

precedent tells the Court that the tax must be pre-empted. In *Tulee*, for example, the fishing right reserved by the Yakamas in the treaty was held to pre-empt the application to the Yakamas of a state law requiring fishermen to buy fishing licenses. 315 U. S., at 684. The Court concluded that "such exaction of fees as a prerequisite to the enjoyment of" a right reserved in the treaty "cannot be reconciled with a fair construction of the treaty." *Id.*, at 685. If the cost of a fishing license interferes with the right to fish, so must a tax imposed on travel with goods (here fuel) interfere with the right to travel. Pp. 10–18.

JUSTICE GORSUCH, joined by JUSTICE GINSBURG, concluded that the 1855 treaty guarantees tribal members the right to move their goods, including fuel, to and from market freely. When dealing with a tribal treaty, a court must "give effect to the terms as the Indians themselves would have understood them." *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 196. The Yakamas' understanding of the terms of the 1855 treaty can be found in a set of unchallenged factual findings in *Yakama Indian Nation* v. *Flores,* 955 F. Supp. 1229, which are binding here and sufficient to resolve this case. They provide "no evidence [suggesting] that the term 'in common with' placed Indians in the same category as non-Indians with respect to any tax or fee the latter must bear with respect to public roads." *Id.*, at 1247. Instead, they suggest that the Yakamas understood the treaty's right-to-travel provision to provide them "with the right to travel on all public highways without being subject to any licensing and permitting fees related to the exercise of that right while engaged in the transportation of tribal goods." *Id.*, at 1262. A wealth of historical evidence confirms this understanding. "Far-reaching travel was an intrinsic ingredient in virtually every aspect of Yakama culture," and travel for purposes of trade was so important to their "way of life that they could not have performed and functioned as a distinct culture" without it. *Id.*, at 1238. Everyone then understood that the treaty would protect the Yakamas' preexisting right to take goods to and from market freely throughout its traditional trading area. The State reads the treaty only as a promise to tribal members of the right to venture out of their reservation and use the public highways like everyone else. But the record shows that the consideration the Yakamas supplied—millions of acres desperately wanted by the United States to settle the Washington Territory—was worth far more than an abject promise they would not be made prisoners on their reservation. This Court's cases interpreting the treaty's neighboring and parallel right-to-fish provision further confirm this understanding. See, *e.g.*, *United States* v. *Winans*, 198 U. S. 371. Pp. 1–11.

BREYER, J., announced the judgment of the Court and delivered an

opinion, in which SOTOMAYOR and KAGAN, JJ., joined.  GORSUCH, J.,
filed an opinion concurring in the judgment, in which GINSBURG, J.,
joined.  ROBERTS, C. J., filed a dissenting opinion, in which THOMAS,
ALITO, and KAVANAUGH, JJ., joined.  KAVANAUGH, J., filed a dissent-
ing opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 16–1498

———

## WASHINGTON STATE DEPARTMENT OF LICENSING, PETITIONER *v.* COUGAR DEN, INC.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WASHINGTON

[March 19, 2019]

JUSTICE BREYER announced the judgment of the Court, and delivered an opinion, in which JUSTICE SOTOMAYOR and JUSTICE KAGAN join.

The State of Washington imposes a tax upon fuel importers who travel by public highway. The question before us is whether an 1855 treaty between the United States and the Yakama Nation forbids the State of Washington to impose that tax upon fuel importers who are members of the Yakama Nation. We conclude that it does, and we affirm the Washington Supreme Court's similar decision.

I

A

A Washington statute applies to "motor vehicle fuel importer[s]" who bring large quantities of fuel into the State by "ground transportation" such as a "railcar, trailer, [or] truck." Wash. Rev. Code §§82.36.010(4), (12), (16) (2012). The statute requires each fuel importer to obtain a license, and it says that a fuel tax will be "levied and imposed upon motor vehicle fuel licensees" for "each gallon of motor vehicle fuel" that the licensee brings into the State. §§82.36.020(1), (2)(c). Licensed fuel importers who

import fuel by ground transportation become liable to pay the tax as of the time the "fuel enters into this [S]tate." §82.36.020(2)(c); see also §§82.38.020(4), (12), (15), (26), 82.38.030(1), (7)(c)(ii) (equivalent regulation of diesel fuel importers).

But *only* those licensed fuel importers who import fuel *by ground transportation* are liable to pay the tax. §§82.36.026(3), 82.36.020(2)(c). For example, if a licensed fuel importer brings fuel into the State by pipeline, that fuel importer need not pay the tax. §§82.36.026(3), 82.36.020(2)(c)(ii), 82.36.010(3). Similarly, if a licensed fuel importer brings fuel into the State by vessel, that fuel importer need not pay the tax. §§82.36.026(3), 82.36.020(2)(c)(ii), 82.36.010(3). Instead, in each of those instances, the next purchaser or possessor of the fuel will pay the tax. §§82.36.020(2)(a), (b), (d). The only licensed fuel importers who must pay *this* tax are the fuel importers who bring fuel into the State by means of ground transportation.

B

The relevant treaty provides for the purchase by the United States of Yakama land. See Treaty Between the United States and the Yakama Nation of Indians, June 9, 1855, 12 Stat. 951. Under the treaty, the Yakamas granted to the United States approximately 10 million acres of land in what is now the State of Washington, *i.e.*, about one-fourth of the land that makes up the State today. Art. I, *id.*, at 951–952; see also Brief for Respondent 4, 9. In return for this land, the United States paid the Yakamas $200,000, made improvements to the remaining Yakama land, such as building a hospital and schools for the Yakamas to use, and agreed to respect the Yakamas' reservation of certain rights. Arts. III–V, 12 Stat. 952–953. Those reserved rights include "the right, in common with citizens of the United States, to travel upon all public

highways," "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory," and other rights, such as the right to hunt, to gather roots and berries, and to pasture cattle on open and unclaimed land. Art. III, *id.*, at 953.

## C

Cougar Den, Inc., the respondent, is a wholesale fuel importer owned by a member of the Yakama Nation, incorporated under Yakama law, and designated by the Yakama Nation as its agent to obtain fuel for members of the Tribe. App. to Pet. for Cert. 63a–64a; App. 99a. Cougar Den buys fuel in Oregon, trucks the fuel over public highways to the Yakama Reservation in Washington, and then sells the fuel to Yakama-owned retail gas stations located within the reservation. App. to Pet. for Cert. 50a, 55a. Cougar Den believes that Washington's fuel import tax, as applied to Cougar Den's activities, is pre-empted by the treaty. App. 15a. In particular, Cougar Den believes that requiring it to pay the tax would infringe the Yakamas' reserved "right, in common with citizens of the United States, to travel upon all public highways." Art. III, 12 Stat. 953.

In December 2013, the Washington State Department of Licensing (Department), believing that the state tax was not pre-empted by the treaty, assessed Cougar Den $3.6 million in taxes, penalties, and licensing fees. App. to Pet. for Cert. 65a; App. 10a. Cougar Den appealed the assessment to higher authorities within the state agency. App. 15a. An Administrative Law Judge agreed with Cougar Den that the tax was pre-empted. App. to Brief in Opposition 14a. The Department's Director, however, disagreed and overturned the ALJ's order. App. to Pet. for Cert. 59a. A Washington Superior Court in turn disagreed with the director and held that the tax was pre-empted. *Id.*, at 34a. The director appealed to the Washington Supreme Court.

188 Wash. 2d 55, 58, 392 P. 3d 1014, 1015 (2017).  And that court, agreeing with Cougar Den, upheld the Superior Court's determination of pre-emption.  *Id.*, at 69, 392 P. 3d, at 1020.

The Department filed a petition for certiorari asking us to review the State Supreme Court's determination.  And we agreed to do so.

## II

### A

The Washington statute at issue here taxes the importation of fuel by public highway.  The Washington Supreme Court construed the statute that way in the decision below.  That court wrote that the statute "taxes the importation of fuel, which is the transportation of fuel."  *Ibid.*  It added that "travel on public highways is directly at issue because the tax [is] an importation tax."  *Id.*, at 67, 392 P. 3d, at 1019.

Nor is there any reason to doubt that the Washington Supreme Court means what it said when it interpreted the Washington statute.  We read the statute the same way. In the statute's own words, Washington "impose[s] upon motor vehicle fuel licensees," including "licensed importer[s]," a tax for "each gallon of motor vehicle fuel" that "enters into this state," but *only* "if . . . entry is" by means of "a railcar, trailer, truck, or other equipment suitable for ground transportation."  Wash. Rev. Code §§82.36.010(4), 82.36.020(1), (2), 82.36.026(3).  As is true of most tax laws, the statute is long and complex, and it is easy to stumble over this technical language.  But if you are able to walk slowly through its provisions, the statute is easily followed.  We need take only five steps.

We start our journey at the beginning of the statute which first declares that "[t]here is hereby levied and imposed upon motor vehicle fuel licensees, other than motor vehicle fuel distributors, a tax at the rate . . . pro-

vided in [the statute] on each gallon of motor vehicle fuel." §82.36.020(1). That is simple enough. Washington imposes a tax on a group of persons called "motor vehicle fuel licensees" for "each gallon of motor vehicle fuel."

Who are the "motor vehicle fuel licensees" that Washington taxes? We take a second step to find out. As the definitions section of the statute explains, the "motor vehicle fuel licensees" upon whom the tax is imposed are "person[s] holding a . . . motor vehicle fuel importer, motor vehicle fuel exporter, motor vehicle fuel blender, motor vehicle distributor, or international fuel tax agreement license." §82.36.010(12). This, too, is easy to grasp. Not everyone who possesses motor vehicle fuel owes the tax. Instead, only motor vehicle fuel importers (and other similar movers and shakers within the motor vehicle fuel industry) who are licensed by the State to deal in fuel, must pay the tax.

But must each of these motor vehicle fuel licensees pay the tax, so that the fuel is taxed as it passes from blender, to importer, to exporter, and so on? We take a third step, and learn that the answer is "no." As the statute explains, "the tax shall be imposed at the time and place of the first taxable event and upon the first taxable person within this state." §82.36.022. Reading that, we understand that only the first licensee who can be taxed, will be taxed.

So, we ask, who is the first taxable licensee? Who must actually pay this tax? We take a fourth step to find out. Logic tells us that the first licensee who can be taxed will likely be the licensee who brings fuel into the State. But, the statute tells us that a "licensed importer" is "liable for and [must] pay tax to the department" when "[m]otor vehicle fuel enters into this state *if* . . . [t]he entry is *not* by bulk transfer." §§82.36.020(2)(c), 82.36.026(3) (emphasis added). That is, a licensed importer can only be the first taxable licensee (and therefore the licensee that must pay the tax) if the importer brings fuel into the State by a

method other than "bulk transfer."

But what is "bulk transfer"? What does it mean to say that licensed fuel importers need only pay the tax if they do not bring in fuel by "bulk transfer"? We take a fifth, and final, step to find out. "[B]ulk transfer," the definitions section explains, "means a transfer of motor vehicle fuel by pipeline or vessel," as opposed to "railcar, trailer, truck, or other equipment suitable for ground transportation." §§82.36.010(3), (4). So, we learn that if the licensed fuel importer brings fuel into the State by ground transportation, then the fuel importer owes the tax. But if the licensed fuel importer brings fuel into the State by pipeline or vessel, then the importer will not be the first taxable person to possess the fuel, and he will not owe the tax.

In sum, Washington taxes travel by ground transportation with fuel. That feature sets the Washington statute apart from other statutes with which we are more familiar. It is not a tax on possession or importation. A statute that taxes possession would ordinarily require all people who own a good to pay the tax. A good example of that would be a State's real estate property tax. That statute would require all homeowners to pay the tax, every year, regardless of the specifics of their situation. And a statute that taxes importation would ordinarily require all people who bring a good into the State to pay a tax. A good example of that would be a federal tax on newly manufactured cars. That statute would ordinarily require all people who bring a new car into the country to pay a tax. But Washington's statute is different because it singles out ground transportation. That is, Washington does not just tax possession of fuel, or even importation of fuel, but instead taxes importation by ground transportation.

The facts of this case provide a good example of the tax in operation. Each of the assessment orders that the Department sent to Cougar Den explained that Cougar Den owed the tax because Cougar Den traveled by high-

way. See App. 10a–26a; App. to Pet. for Cert. 55a. As the director explained, Cougar Den owed the tax because Cougar Den had caused fuel to enter "into this [S]tate at the Washington-Oregon boundary on the Highway 97 bridge" by means of a "tank truck" destined for "the Yakama Reservation." *Ibid.* The director offers this explanation in addition to quoting the quantity of fuel that Cougar Den possessed because the element of travel by ground transportation is a necessary prerequisite to the imposition of the tax. Put another way, the State must prove that Cougar Den *traveled by highway* in order to apply its tax.

B

We are not convinced by the arguments raised to the contrary. The Department claims, and THE CHIEF JUSTICE agrees, that the state tax has little or nothing to do with the treaty because it is not a tax on *travel with fuel* but rather a tax on the *possession of fuel*. See Brief for Petitioner 26–28; *post*, at 5 (dissenting opinion).

We cannot accept that characterization of the tax, however, for the Washington Supreme Court has authoritatively held that the statute is a tax on travel. The Washington Supreme Court held that the Washington law at issue here "taxes the importation of fuel, which is the transportation of fuel." 188 Wash. 2d, at 69, 392 P. 3d, at 1020. It added that "travel on public highways is directly at issue because the tax [is] an importation tax." *Id.*, at 67, 392 P. 3d, at 1019. In so doing, the State Supreme Court heard, considered, and rejected the construction of the fuel tax that the Department advances here. See *ibid.*, 392 P. 3d, at 1019 ("The Department argues, and the director agreed, that the taxes are assessed based on incidents of ownership or possession of fuel, and not incident to use of or travel on the roads or highways. . . . The Department's argument is unpersuasive. . . . Here, travel

on public highways is directly at issue because the tax was an importation tax"). The incidence of a tax is a question of state law, *Oklahoma Tax Comm'n* v. *Chickasaw Nation*, 515 U. S. 450, 461 (1995), and this Court is bound by the Washington Supreme Court's interpretation of Washington law, *Johnson* v. *United States*, 559 U. S. 133, 138 (2010). We decline the Department's invitation to overstep the bounds of our authority and construe the tax to mean what the Washington Supreme Court has said it does not.

Nor would it make sense to construe the tax's incidence differently. The Washington Supreme Court's conclusion follows directly from its (and our) interpretation of how the tax operates. See *supra*, at 4–7. To be sure, it is generally true that fuel imported into the State by trucks driving the public highways *can also* be described as fuel that is *possessed for the first time* in the State. But to call the Washington statute a tax on "first possession" would give the law an over-inclusive label. As explained at length above, there are several ways in which a company could be a "first possessor" of fuel without incurring the tax. See *ibid.* For example, Cougar Den would not owe the tax had Cougar Den "first possessed" fuel by piping fuel from out of State into a Washington refinery. First possession is not taxed if the fuel is brought into the State by pipeline and bound for a refinery. §§82.36.026(3), 82.36.020(2)(c)(ii), 82.36.010(3). Similarly, Cougar Den would not owe the tax had Cougar Den "first possessed" fuel by bringing fuel into Washington through its waterways rather than its highways. First possession is not taxed if the fuel is brought into the State by vessel. §§82.36.026(3), 82.36.020(2)(c)(ii), 82.36.010(3). Thus, it seems rather clear that the tax cannot accurately be described as a tax on the *first possession of fuel*.

But even if the contrary were true, the tax would still have the practical effect of burdening the Yakamas' travel.

Here, the Yakamas' lone off-reservation act within the State is traveling along a public highway with fuel. The tax thus operates on the Yakamas exactly like a tax on transportation would: It falls upon them only because they happened to transport goods on a highway while en route to their reservation. And it is the practical effect of the state law that we have said makes the difference. We held, for instance, that the fishing rights reserved in the treaty pre-empted the State's enforcement of a trespass law against Yakama fishermen crossing private land to access the river. See, *e.g.*, *United States* v. *Winans*, 198 U. S. 371, 381 (1905). That was so even though the trespass law was not limited to those who trespass in order to fish but applied more broadly to any trespasser. Put another way, it mattered not that the tax was "on" trespassing rather than fishing because the tax operated upon the Yakamas when they were exercising their treaty-protected right. *Ibid.*; see also *Tulee* v. *Washington*, 315 U. S. 681, 685 (1942) (holding that the fishing rights reserved in the treaty pre-empted the State's application of a fishing licensing fee to a Yakama fisherman, even though the fee also applied to types of fishing not practiced by the Yakamas). And this approach makes sense. When the Yakamas bargained in the treaty to protect their right to travel, they could only have cared about preventing the State from burdening their exercise of that right. To the Yakamas, it is thus irrelevant whether the State's tax might apply to other activities beyond transportation. The only relevant question is whether the tax "act[ed] upon the Indians as a charge for exercising the very right their ancestors intended to reserve." *Tulee*, 315 U. S., at 685. And the State's tax here acted upon Cougar Den in exactly that way.

For the same reason, we are unpersuaded by the Department's insistence that it adopted this tax after a District Court, applying this Court's decision in *Chickasaw*

10    WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

Opinion of BREYER, J.

*Nation*, barred the State from taxing the sale of fuel products on tribal land. See Brief for Petitioner 6–7; *Squaxin Island Tribe* v. *Stephens*, 400 F. Supp. 2d 1250, 1262 (WD Wash. 2005). Although a State "generally is free to amend its law to shift the tax's legal incidence," *Chickasaw Nation*, 515 U. S., at 460, it may not burden a treaty-protected right in the process, as the State has done here.

Thus, we must turn to the question whether this fuel tax, falling as it does upon members of the Tribe who travel on the public highways, violates the treaty.

## III

### A

In our view, the State of Washington's application of the fuel tax to Cougar Den's importation of fuel is pre-empted by the treaty's reservation to the Yakama Nation of "the right, in common with citizens of the United States, to travel upon all public highways." We rest this conclusion upon three considerations taken together.

First, this Court has considered this treaty four times previously; each time it has considered language very similar to the language before us; and each time it has stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855. See *Winans*, 198 U. S., at 380–381; *Seufert Brothers Co.* v. *United States*, 249 U. S. 194, 196–198 (1919); *Tulee*, 315 U. S., at 683–685; *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 677–678 (1979).

The treaty language at issue in each of the four cases is similar, though not identical, to the language before us. The cases focus upon language that guarantees to the Yakamas "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory." Art. III, para. 2, 12 Stat. 953. Here, the language guarantees to the Yakamas "the right, in common with citizens of

the United States, to travel upon all public highways." Art. III, para. 1, *ibid*. The words "in common with" on their face could be read to permit application to the Yakamas of general legislation (like the legislation before us) that applies to all citizens, Yakama and non-Yakama alike. But this Court concluded the contrary because that is not what the Yakamas understood the words to mean in 1855. See *Winans*, 198 U. S., at 379, 381; *Seufert Brothers*, 249 U. S., at 198–199; *Tulee*, 315 U. S., at 684; *Fishing Vessel*, 443 U. S., at 679, 684–685.

The cases base their reasoning in part upon the fact that the treaty negotiations were conducted in, and the treaty was written in, languages that put the Yakamas at a significant disadvantage. See, *e.g.*, *Winans*, 198 U. S., at 380; *Seufert Brothers*, 249 U. S., at 198; *Fishing Vessel*, 443 U. S., at 667, n. 10. The parties negotiated the treaty in Chinook jargon, a trading language of about 300 words that no Tribe used as a primary language. App. 65a; *Fishing Vessel*, 443 U. S., at 667, n. 10. The parties memorialized the treaty in English, a language that the Yakamas could neither read nor write. And many of the representations that the United States made about the treaty had no adequate translation in the Yakamas' own language. App. 68a–69a.

Thus, in the year 1905, in *Winans*, this Court wrote that, to interpret the treaty, courts must focus upon the historical context in which it was written and signed. 198 U. S., at 381; see also *Tulee*, 315 U. S., at 684 ("It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council"); cf. *Water Splash, Inc.* v. *Menon*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 8) (noting that, to ascertain the meaning of a treaty, courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties")

12      WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

Opinion of BREYER, J.

(internal quotation marks omitted).

The Court added, in light of the Yakamas' understanding in respect to the reservation of fishing rights, the treaty words "in common with" do not limit the reservation's scope to a right against discrimination. *Winans*, 198 U. S., at 380–381. Instead, as we explained in *Tulee*, *Winans* held that "Article III [of the treaty] conferred upon the Yakimas continuing rights, *beyond those which other citizens may enjoy*, to fish at their 'usual and accustomed places' in the ceded area." *Tulee*, 315 U. S., at 684 (citing *Winans*, 198 U. S. 371; emphasis added). Also compare, *e.g.*, *Fishing Vessel*, 443 U. S., at 677, n. 22 ("Whatever opportunities the treaties assure Indians with respect to fish are admittedly *not 'equal' to*, *but are to some extent greater than*, those afforded other citizens" (emphasis added)), with *post*, at 4 (KAVANAUGH, J., dissenting) (citing this same footnote in *Fishing Vessel* as support for the argument that the treaty guarantees the Yakamas only a right against discrimination). Construing the treaty as giving the Yakamas only antidiscrimination rights, rights that any inhabitant of the territory would have, would amount to "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." *Winans*, 198 U. S., at 380.

Second, the historical record adopted by the agency and the courts below indicates that the right to travel includes a right to travel with goods for sale or distribution. See App. to Pet. for Cert. 33a; App. 56a–74a. When the United States and the Yakamas negotiated the treaty, both sides emphasized that the Yakamas needed to protect their freedom to travel so that they could continue to fish, to hunt, to gather food, and to trade. App. 65a–66a. The Yakamas maintained fisheries on the Columbia River, following the salmon runs as the fish moved through Yakama territory. *Id.*, at 62a–63a. The Yakamas traveled to the nearby plains region to hunt buffalo. *Id.*, at 61a.

They traveled to the mountains to gather berries and roots. *Ibid.* The Yakamas' religion and culture also depended on certain goods, such as buffalo byproducts and shellfish, which they could often obtain only through trade. *Id.*, at 61a–62a. Indeed, the Yakamas formed part of a great trading network that stretched from the Indian tribes on the Northwest coast of North America to the plains tribes to the east. *Ibid.*

The United States' representatives at the treaty negotiations well understood these facts, including the importance of travel and trade to the Yakamas. *Id.*, at 63a. They repeatedly assured the Yakamas that under the treaty the Yakamas would be able to travel outside their reservation on the roads that the United States built. *Id.*, at 66a–67a; see also, *e.g.*, *id.*, at 66a ("'[W]e give you the privilege of traveling over roads'"). And the United States repeatedly assured the Yakamas that they could travel along the roads for trading purposes. *Id.*, at 65a–67a. Isaac Stevens, the Governor of the Washington Territory, told the Yakamas, for example, that, under the terms of the treaty, "You will be allowed to go on the roads, to take your things to market, your horses and cattle." App. to Brief for Confederated Tribes and Bands of the Yakama Nation as *Amicus Curiae* 68a (record of the treaty proceedings). He added that the Yakamas "will be allowed to go to the usual fishing places and fish in common with the whites, and to get roots and berries and to kill game on land not occupied by the whites; all this outside the Reservation." *Ibid.* Governor Stevens further urged the Yakamas to accept the United States' proposals for reservation boundaries in part because the proposal put the Yakama Reservation in close proximity to public highways that would facilitate trade. He said, "'You will be near the great road and can take your horses and your cattle down the river and to the [Puget] Sound to market.'" App. 66a. In a word, the treaty negotiations and the United States'

14 WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

Opinion of BREYER, J.

representatives' statements to the Yakamas would have led the Yakamas to understand that the treaty's protection of the right to travel on the public highways included the right to travel with goods for purposes of trade. We consequently so construe the relevant treaty provision.

Third, to impose a tax upon traveling with certain goods burdens that travel. And the right to travel on the public highways without such burdens is, as we have said, just what the treaty protects. Therefore, our precedents tell us that the tax must be pre-empted. In *Tulee*, for example, we held that the fishing right reserved by the Yakamas in the treaty pre-empted the application to the Yakamas of a state law requiring fishermen to buy fishing licenses. 315 U. S., at 684. We concluded that "such exaction of fees as a prerequisite to the enjoyment of" a right reserved in the treaty "cannot be reconciled with a fair construction of the treaty." *Id.*, at 685. If the cost of a fishing license interferes with the right to fish, so must a tax imposed on travel with goods (here fuel) interfere with the right to travel.

We consequently conclude that Washington's fuel tax "acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve." *Ibid.* Washington's fuel tax cannot lawfully be assessed against Cougar Den on the facts here. Treaties with federally recognized Indian tribes—like the treaty at issue here—constitute federal law that pre-empts conflicting state law as applied to off-reservation activity by Indians. Cf. *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148–149 (1973).

### B

Again, we are not convinced by the arguments raised to the contrary. THE CHIEF JUSTICE concedes that "the right to travel with goods is just an application of the Yakamas' right to travel." *Post*, at 2 (dissenting opinion); see also *ibid.* ("It ensures that the Yakamas enjoy the same privi-

leges when they travel with goods as when they travel without them."). But he nevertheless insists that, because of the way in which the Washington statute taxes fuel, the statute does not interfere with the right to travel reserved by the Yakamas in the treaty. *Post*, at 3.

First, THE CHIEF JUSTICE finds it significant that "[t]he tax is calculated per gallon of fuel; not, like a toll, per vehicle or distance traveled." *Ibid.*, see also *ibid.* ("The tax before us does not resemble a blockade or a toll"). But that argument fails on its own terms. A toll on highway travel is no less a toll when the toll varies based on the number of axels on a vehicle traveling the highway, or on the number of people traveling in the vehicle. We cannot, therefore, see why the number of gallons of fuel that the vehicle carries should make all the difference. Put another way, the fact that a tax on travel varies based on the features of that travel does not mean that the tax is not a tax on travel.

Second, THE CHIEF JUSTICE argues that it "makes no sense," for example, to hold that "a tax on certain luxury goods" that is assessed the first time the goods are possessed in Washington cannot apply to a Yakama member "who buys" a mink coat "over the state line in Portland and then drives back to the reservation," but the tax can apply to a Yakama member who "buys a mink coat at an off-reservation store in Washington." *Post*, at 4. The short, conclusive answer to this argument is that there is a treaty that forbids taxing Yakama travel on highways with goods (*e.g.*, fuel, or even furs) for market; and there is no treaty that forbids taxing Yakama off-reservation purchases of goods. Indeed, if our precedents supported THE CHIEF JUSTICE's rule, then our fishing rights cases would have turned on whether Washington also taxed fish purchased in the grocery store. Compare, *e.g.*, *Tulee*, 315 U. S., at 682, n. 1 (holding that the fishing right reserved by the Yakamas in the treaty pre-empted the application

16      WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

Opinion of BREYER, J.

to the Yakamas of a state law which prohibited "'catch[ing] . . . fish for food'" without having purchased a license). But in those cases, we did not look to whether fish were taxed elsewhere in Washington. That is because the treaty does not protect the Yakamas from state sales taxes imposed on the off-reservation sale of goods. Instead, the treaty protects the Yakamas' right to travel the public highways without paying state taxes on that activity, much like the treaty protects the Yakamas' right to fish without paying state taxes on that activity.

Third, THE CHIEF JUSTICE argues that only a law that "punished or charged the Yakamas" for an "integral feature" of a treaty right could be pre-empted by the treaty. *Post*, at 6. But that is true of the Washington statute at issue here. The treaty protects the right to travel with goods, see *supra*, at 10–14, and the Washington statute taxes travel with goods, see *supra*, at 4–7. Therefore, the statute charges the Yakamas for an "integral feature" of a treaty right. But even if the statute indirectly burdened a treaty right, under our precedents, the statute would still be pre-empted. One of the Washington statutes at issue in *Winans* was not a fishing regulation, but instead a trespassing statute. That trespassing statute indirectly burdened the right to fish by preventing the Yakamas from crossing privately owned land so that the Yakamas could reach their traditional fishing places and camp on that private property during the fishing season. See 198 U. S., at 380–381. It cannot be true that a law prohibiting trespassing imposed a burden on the right to fish that is "integral" enough to be pre-empted by the treaty, while a law taxing goods carried to the reservation on the public highway imposes a burden on the right to travel that is too attenuated to be pre-empted by the treaty.

C

Although we hold that the treaty protects the right to

travel on the public highway with goods, we do not say or imply that the treaty grants protection to carry any and all goods. Nor do we hold that the treaty deprives the State of the power to regulate, say, when necessary for conservation. To the contrary, we stated in *Tulee* that, although the treaty "forecloses the [S]tate from charging the Indians a fee of the kind in question here," the State retained the "power to impose on Indians, equally with others, such restrictions of a purely regulatory nature . . . as are necessary for the conservation of fish." 315 U. S., at 684. Indeed, it was crucial to our decision in *Tulee* that, although the licensing fees at issue were "regulatory as well as revenue producing," "their regulatory purpose could be accomplished otherwise," and "the imposition of license fees [was] not indispensable to the effectiveness of a state conservation program." *Id.*, at 685. See also *Puyallup Tribe* v. *Department of Game of Wash.*, 391 U. S. 392, 402, n. 14 (1968) ("As to a 'regulation' concerning the time and manner of fishing outside the reservation (as opposed to a 'tax'), we said that the power of the State was to be measured by whether it was 'necessary for the conservation of fish'" (quoting *Tulee*, 315 U. S., at 684)).

Nor do we hold that the treaty deprives the State of the power to regulate to prevent danger to health or safety occasioned by a tribe member's exercise of treaty rights. The record of the treaty negotiations may not support the contention that the Yakamas expected to use the roads entirely unconstrained by laws related to health or safety. See App. to Brief for Confederated Tribes and Bands of the Yakama Nation as *Amicus Curiae* 20a–21a, 31a–32a. Governor Stevens explained, at length, the United States' awareness of crimes committed by United States citizens who settled amongst the Yakamas, and the United States' intention to enact laws that would restrain both the United States citizens and the Yakamas alike for the safety of both groups. See *id.*, at 31a.

18      WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

Opinion of BREYER, J.

Nor do we here interpret the treaty as barring the State from collecting revenue through sales or use taxes (applied outside the reservation). Unlike the tax at issue here, which applies explicitly to transport by "railcar, trailer, truck, or other equipment suitable for ground transportation," see *supra*, at 6, a sales or use tax normally applies irrespective of transport or its means. Here, however, we deal with a tax applicable simply to importation by ground transportation. Moreover, it is a tax designed to secure revenue that, as far as the record shows here, the State might obtain in other ways.

## IV

To summarize, our holding rests upon three propositions: First, a state law that burdens a treaty-protected right is pre-empted by the treaty. See *supra*, at 14–18. Second, the treaty protects the Yakamas' right to travel on the public highway with goods for sale. See *supra*, at 10–14. Third, the Washington statute at issue here taxes the Yakamas for traveling with fuel by public highway. See *supra*, at 4–10. For these three reasons, Washington's fuel tax cannot lawfully be assessed against Cougar Den on the facts here. Therefore, the judgment of the Supreme Court of Washington is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 16–1498

————

## WASHINGTON STATE DEPARTMENT OF LICENSING, PETITIONER *v.* COUGAR DEN, INC.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

[March 19, 2019]

JUSTICE GORSUCH, with whom JUSTICE GINSBURG joins, concurring in the judgment.

The Yakamas have lived in the Pacific Northwest for centuries. In 1855, the United States sought and won a treaty in which the Tribe agreed to surrender 10 million acres, land that today makes up nearly a quarter of the State of Washington. In return, the Yakamas received a reservation and various promises, including a guarantee that they would enjoy "the right, in common with citizens of the United States, to travel upon all public highways." Today, the parties offer dueling interpretations of this language. The State argues that it merely allows the Yakamas to travel on public highways like everyone else. And because everyone else importing gasoline from out of State by highway must pay a tax on that good, so must tribal members. Meanwhile, the Tribe submits that the treaty guarantees tribal members the right to move their goods to and from market freely. So that tribal members may bring goods, including gasoline, from an out-of-state market to sell on the reservation without incurring taxes along the way.

Our job here is a modest one. We are charged with adopting the interpretation most consistent with the treaty's original meaning. *Eastern Airlines, Inc.* v. *Floyd*, 499 U. S. 530, 534–535 (1991). When we're dealing with a

tribal treaty, too, we must "give effect to the terms as the Indians themselves would have understood them." *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 196 (1999). After all, the United States drew up this contract, and we normally construe any ambiguities against the drafter who enjoys the power of the pen. Nor is there any question that the government employed that power to its advantage in this case. During the negotiations "English words were translated into Chinook jargon . . . although that was not the primary language" of the Tribe. *Yakama Indian Nation* v. *Flores*, 955 F. Supp. 1229, 1243 (ED Wash. 1997). After the parties reached agreement, the U. S. negotiators wrote the treaty in English—a language that the Yakamas couldn't read or write. And like many such treaties, this one was by all accounts more nearly imposed on the Tribe than a product of its free choice.

When it comes to the Yakamas' understanding of the treaty's terms in 1855, we have the benefit of a set of unchallenged factual findings. The findings come from a separate case involving the Yakamas' challenge to certain restrictions on their logging operations. *Id.*, at 1231. The state Superior Court relied on these factual findings in this case and held Washington collaterally estopped from challenging them. Because the State did not challenge the Superior Court's estoppel ruling either in the Washington Supreme Court or here, these findings are binding on us as well.

They also tell us all we need to know to resolve this case. To some modern ears, the right to travel in common with others might seem merely a right to use the roads subject to the same taxes and regulations as everyone else. *Post*, at 1–2 (KAVANAUGH, J., dissenting). But that is not how the Yakamas understood the treaty's terms. To the Yakamas, the phrase "'in common with' . . . implie[d] that the Indian and non-Indian use [would] be joint but [did]

not imply that the Indian use [would] be in any way restricted." *Yakama Indian Nation*, 955 F. Supp., at 1265. In fact, "[i]n the Yakama language, the term 'in common with' ... suggest[ed] public use or general use without restriction." *Ibid.* So "[t]he most the Indians would have understood . . . of the term[s] 'in common with' and 'public' was that they would share the use of the road with whites." *Ibid.* Significantly, there is "no evidence [to] sugges[t] that the term 'in common with' placed Indians in the same category as non-Indians with respect to any tax or fee the latter must bear with respect to public roads." *Id.*, at 1247. Instead, the evidence suggests that the Yakamas understood the right-to-travel provision to provide them "with the right to travel on all public highways without being subject to any licensing and permitting fees related to the exercise of that right while engaged in the transportation of tribal goods." *Id.*, at 1262.

Applying these factual findings to our case requires a ruling for the Yakamas. As the Washington Supreme Court recognized, the treaty's terms permit regulations that allow the Yakamas and non-Indians to share the road in common and travel along it safely together. But they do not permit encumbrances on the ability of tribal members to bring their goods to and from market. And by everyone's admission, the state tax at issue here isn't about facilitating peaceful coexistence of tribal members and non-Indians on the public highways. It is about taxing a good as it passes to and from market—exactly what the treaty forbids.

A wealth of historical evidence confirms this understanding. The *Yakama Indian Nation* decision supplies an admirably rich account of the history, but it is enough to recount just some of the most salient details. "Prior to and at the time the treaty was negotiated," the Yakamas "engaged in a system of trade and exchange with other plateau tribes" and tribes "of the Northwest coast and

plains of Montana and Wyoming." *Ibid.* This system
came with no restrictions; the Yakamas enjoyed "free and
open access to trade networks in order to maintain their
system of trade and exchange." *Id.*, at 1263. They trav-
eled to Oregon and maybe even to California to trade "fir
trees, lava rocks, horses, and various species of salmon."
*Id.*, at 1262–1263. This extensive travel "was necessary to
obtain goods that were otherwise unavailable to [the
Yakamas] but important for sustenance and religious
purposes." *Id.*, at 1262. Indeed, "far-reaching travel was
an intrinsic ingredient in virtually every aspect of Yakama
culture." *Id.*, at 1238. Travel for purposes of trade was so
important to the "Yakamas' way of life that they could not
have performed and functioned as a distinct culture . . .
without extensive travel." *Ibid.* (internal quotation marks
omitted).

Everyone understood that the treaty would protect the
Yakamas' preexisting right to take goods to and from
market freely throughout their traditional trading area.
"At the treaty negotiations, a primary concern of the Indi-
ans was that they have freedom to move about to . . .
trade." *Id.*, at 1264. Isaac Stevens, the Governor of the
Washington Territory, specifically promised the Yakamas
that they would "'be allowed to go on the roads to take
[their] things to market.'" *Id.*, at 1244 (emphasis deleted).
Governor Stevens called this the "'same libert[y]'" to
travel with goods free of restriction "'outside the reserva-
tion'" that the Tribe would enjoy within the new reserva-
tion's boundaries. *Ibid.* Indeed, the U. S. representatives'
"statements regarding the Yakama's use of the public
highways to take their goods to market clearly and with-
out ambiguity promised the Yakamas the use of public
highways without restriction for future trading endeav-
ors." *Id.*, at 1265. Before the treaty, then, the Yakamas
traveled extensively without paying taxes to bring goods to
and from market, and the record suggests that the Yaka-

mas would have understood the treaty to preserve that liberty.

None of this can come as much of a surprise. As the State reads the treaty, it promises tribal members only the right to venture out of their reservation and use the public highways like everyone else. But the record shows that the consideration the Yakamas supplied was worth far more than an abject promise they would not be made prisoners on their reservation. In fact, the millions of acres the Tribe ceded were a prize the United States desperately wanted. U. S. treaty negotiators were "under tremendous pressure to quickly negotiate treaties with eastern Washington tribes, because lands occupied by those tribes were important in settling the Washington territory." *Id.*, at 1240. Settlers were flooding into the Pacific Northwest and building homesteads without any assurance of lawful title. The government needed "to obtain title to Indian lands" to place these settlements on a more lawful footing. *Ibid.* The government itself also wanted to build "wagon and military roads through Yakama lands to provide access to the settlements on the west side of the Cascades." *Ibid.* So "obtaining Indian lands east of the Cascades became a central objective" for the government's own needs. *Id.*, at 1241. The Yakamas knew all this and could see the writing on the wall: One way or another, their land would be taken. If they managed to extract from the negotiations the simple right to take their goods freely to and from market on the public highways, it was a price the United States was more than willing to pay. By any fair measure, it was a bargain-basement deal.

Our cases interpreting the treaty's neighboring and parallel right-to-fish provision further confirm this understanding. The treaty "secure[s] . . . the right of taking fish at all usual and accustomed places, *in common with* citizens of the Territory." Treaty Between the United States

and the Yakama Nation of Indians, Art. III, June 9, 1855, 12 Stat. 953 (emphasis added). Initially, some suggested this guaranteed tribal members only the right to fish according to the same regulations and subject to the same fees as non-Indians. But long ago this Court refused to impose such an "impotent" construction on the treaty. *United States* v. *Winans*, 198 U. S. 371, 380 (1905). Instead, the Court held that the treaty language prohibited state officials from imposing many nondiscriminatory fees and regulations on tribal members. While such laws "may be both convenient and, in [their] general impact, fair," this Court observed, they act "upon the Indians as a charge for exercising the very right their ancestors intended to reserve." *Tulee* v. *Washington*, 315 U. S. 681, 685 (1942). Interpreting the same treaty right in *Winans,* we held that, despite arguments otherwise, "the phrase '*in common with* citizens of the Territory'" confers "upon the Yak[a]mas continuing rights, *beyond those which other citizens may enjoy*, to fish at their 'usual and accustomed places.'" *Tulee*, 315 U. S., at 684 (citing *Winans*, 198 U. S., at 371; emphasis added). Today, we simply recognize that the same language should yield the same result.

With its primary argument now having failed, the State encourages us to labor through a series of backups. It begins by pointing out that the treaty speaks of allowing the Tribe "free access" from local roads to the public highways, but indicates that tribal members are to use those highways "in common with" non-Indians. On the State's account, these different linguistic formulations must be given different meanings. And the difference the State proposes? No surprise: It encourages us to read the former language as allowing goods to be moved tax-free along local roads to the highways but the latter language as authorizing taxes on the Yakamas' goods once they arrive there. See also *post*, at 3 (KAVANAUGH, J., dissenting).

The trouble is that nothing in the record supports this interpretation. Uncontested factual findings reflect the Yakamas' understanding that the treaty would allow them to use the highways to bring goods to and from market freely. These findings bind us under the doctrine of collateral estoppel, and no one has proposed any lawful basis for ignoring them. Nor, for that matter, has anyone even tried to offer a reason why the Tribe might have bargained for the right to move its goods freely only part of the way to market. Our job in this case is to interpret the treaty as the Yakamas originally understood it in 1855—not in light of new lawyerly glosses conjured up for litigation a continent away and more than 150 years after the fact.

If that alternative won't work, the State offers another. It admits that the Yakamas personally may have a right to travel the highways free of most restrictions on their movement. See also *post*, at 3 (ROBERTS, C. J., dissenting) (acknowledging that the treaty prohibits the State from "charg[ing] . . . a toll" on Yakamas traveling on the highway). But, the State continues, the law at issue here doesn't offend that right. It doesn't, we are told, because the "object" of the State's tax isn't *travel* but the *possession* of fuel; the fact that the State happens to assess its tax when fuel is possessed on a public highway rather than someplace else is neither here nor there. And just look, we are told, at the anomalies that might arise if we ruled otherwise. A tribal member who buys a "mink coat" in a Washington store would have to pay the State's sales tax, but a tribal member who purchases the same coat at market in Oregon could not be taxed for possessing it on the highway when reentering Washington. See *post*, at 2–7.

This argument suffers from much the same problem as its predecessors. Now, at least, the State may acknowledge that the Yakamas personally have a right to travel free of most restrictions. But the State still fails to

give full effect to the treaty's terms and the Yakamas' original understanding of them. After all and as we've seen, the treaty doesn't just guarantee tribal members the right to *travel* on the highways free of most restrictions on their movement; it also guarantees tribal members the right to *move goods* freely to and from market using those highways. And it's impossible to *transport* goods without *possessing* them. So a tax that falls on the Yakamas' possession of goods as they travel to and from market on the highway violates the treaty just as much as a tax on travel alone would.

Consider the alternative. If the State could save the tax here simply by labeling it a fee on the "possession" of a good, the State might just as easily revive the fishing license fee *Tulee* struck down simply by calling it a fee on the "possession" of fish. That, of course, would be ridiculous. The Yakamas' right to fish includes the right to *possess* the fish they catch—just like their right to *move* goods on the highways embraces the right to *possess* them there. Nor does the State's reply solve the problem. It accepts, as it must, that possessing fish is "integral" to the right to fish. *Post*, at 6, n. 2 (ROBERTS, C. J., dissenting). But it stands pat on its assertion that the treaty protects nothing more than a personal right to travel, ignoring all of the facts and binding findings before us establishing that the treaty *also* guarantees a right to move (and so possess) goods freely as they travel to and from market. *Ibid.*

What about the supposed "mink coat" anomaly? Under the terms of the treaty before us, it's true that a Yakama who buys a mink coat (or perhaps some more likely item) at an off-reservation store in Washington will have to pay sales tax because the treaty is silent there. And it is also true that a Yakama who buys the same coat right over the state line, pays any taxes due at market there, and then drives back to the reservation using the public highways is

entitled to move that good tax-free from market back to the reservation. But that is hardly anomalous—*that* is the treaty right the Yakamas reserved. And it's easy to see why. Imagine the Yakama Reservation reached the Washington/Oregon state line (as it did before the 1855 Treaty). In that case, Washington would have no basis to tax the Yakamas' transportation of goods from Oregon (whether they might be fuel, mink coats, or anything else), as all of the Yakamas' conduct would take place outside of the State or on the reservation. The only question here is whether the result changes because the Tribe must now use Washington's highways to make the trek home. And the answer is no. The Tribe bargained for a right to travel with goods off reservation just as it could on reservation and just as it had for centuries. If the State and federal governments do not like that result, they are free to bargain for more, but they do not get to rewrite the existing bargain in this Court.

Alternatively yet, the State warns us about the dire consequences of a ruling against it. Highway speed limits, reckless driving laws, and much more, the State tells us, will be at risk if we rule for the Tribe. See also *post*, at 7–10 (ROBERTS, C. J., dissenting). But notice. Once you acknowledge (as the State and primary dissent just have) that the Yakamas *themselves* enjoy a right to travel free of at least some nondiscriminatory state regulations, this "problem" inevitably arises. It inevitably arises, too, once you concede that the Yakamas enjoy a right to travel freely at least on local roads. See *post*, at 3 (KAVANAUGH, J., dissenting). Whether you read the treaty to afford the Yakamas the further right to bring goods to and from market is beside the point.

It turns out, too, that the State's parade of horribles isn't really all that horrible. While the treaty supplies the Yakamas with special rights to travel with goods to and from market, we have seen already that its "in common

10    WASHINGTON STATE DEPT. OF LICENSING *v.*
COUGAR DEN, INC.

GORSUCH, J., concurring in judgment

with" language *also* indicates that tribal members knew they would have to "share the use of the road with whites" and accept regulations designed to allow the two groups' safe coexistence. *Yakama Indian Nation*, 955 F. Supp., at 1265. Indeed, the Yakamas *expected* laws designed to "protec[t]" their ability to travel safely alongside non-Indians on the highways. See App. to Brief for Confederated Tribes and Bands of the Yakama Nation as *Amicus Curiae* 21a, 31a. Maybe, too, that expectation goes some way toward explaining why the State's hypothetical parade of horribles has yet to take its first step in the real world. No one before us has identified a single challenge to a state highway speed limit, reckless driving law, or other critical highway safety regulation in the entire life of the Yakama treaty.

Retreating now, the State suggests that the real problem isn't so much about the Yakamas themselves traveling freely as it is with their goods doing so. We are told we should worry, for example, about limiting Washington's ability to regulate the transportation of diseased apples from Oregon. See also *post*, at 10 (ROBERTS, C. J., dissenting). But if bad apples prove to be a public menace, Oregon and its localities may regulate them when they are grown or picked at the orchard. Oregon, its localities, and maybe even the federal government may regulate the bad apples when they arrive at market for sale in Oregon. The Tribe and again, perhaps, the federal government may regulate the bad apples when they arrive on the reservation. And if the bad apples somehow pose a threat to safe travel on the highways, even Washington may regulate them as they make their way from Oregon to the reservation—just as the State may require tribal members to abide nondiscriminatory regulations governing the safe transportation of flammable cargo as they drive their gas trucks from Oregon to the reservation along public highways. The only thing that Washington may not do is

reverse the promise the United States made to the Yakamas in 1855 by imposing a tax or toll on tribal members or their goods as they pass to and from market.

Finally, some worry that, if we recognize the potential permissibility of state highway safety laws, we might wind up impairing the interests of "tribal members across the country." See *post*, at 10 (ROBERTS, C. J., dissenting). But our decision today is based on unchallenged factual findings about how the Yakamas themselves understood this treaty in light of the negotiations that produced it. And the Tribe itself has expressly acknowledged that its treaty, while extending real and valuable rights to tribal members, does not preclude laws that merely facilitate the safe use of the roads by Indians and non-Indians alike. Nor does anything we say here necessarily apply to other tribes and other treaties; each must be taken on its own terms. In the end, then, the only true threat to tribal interests today would come from replacing the meaningful right the Yakamas thought they had reserved with the trivial promise the State suggests.

Really, this case just tells an old and familiar story. The State of Washington includes millions of acres that the Yakamas ceded to the United States under significant pressure. In return, the government supplied a handful of modest promises. The State is now dissatisfied with the consequences of one of those promises. It is a new day, and now it wants more. But today and to its credit, the Court holds the parties to the terms of their deal. It is the least we can do.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1498

_____

## WASHINGTON STATE DEPARTMENT OF LICENSING, PETITIONER *v.* COUGAR DEN, INC.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

[March 19, 2019]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS, JUSTICE ALITO, and JUSTICE KAVANAUGH join, dissenting.

In the 1855 treaty in which the Yakamas surrendered most of their lands to the United States, the Tribe sought to protect its way of life by reserving, among other rights, "the right, in common with citizens of the United States, to travel upon all public highways."  Treaty Between the United States and the Yakama Nation of Indians, Art. III, June 9, 1855, 12 Stat. 953.  Cougar Den, a Yakama corporation that uses public highways to truck gas into Washington, contends that the treaty exempts it from Washington's fuel tax, which the State assesses upon the importation of fuel into the State.  The plurality agrees, concluding that Washington cannot impose the tax on Cougar Den because doing so would "have the practical effect of burdening" Cougar Den's exercise of its right to travel on the highways.  *Ante*, at 9.  The concurrence reaches the same result, reasoning that, because the Yakamas' right to travel includes the right to travel with goods, the State cannot tax or regulate the Yakamas' goods on the highways.  *Ante*, at 7–8 (GORSUCH, J., concurring in judgment).

But the mere fact that a state law has an effect on the Yakamas *while* they are exercising a treaty right does not establish that the law impermissibly burdens the right

itself.  And the right to travel with goods is just an appli-
cation of the Yakamas' right to travel.  It ensures that the
Yakamas enjoy the same privileges when they travel with
goods as when they travel without them.  It is not an
additional right to possess whatever goods they wish on
the highway, immune from regulation and taxation.
Under our precedents, a state law violates a treaty right
only if the law imposes liability upon the Yakamas "for
exercising the very right their ancestors intended to re-
serve."  *Tulee* v. *Washington*, 315 U. S. 681, 685 (1942).
Because Washington is taxing Cougar Den for possessing
fuel, not for traveling on the highways, the State's method
of administering its fuel tax is consistent with the treaty.
I respectfully dissent from the contrary conclusion of the
plurality and concurrence.[1]

   We have held on three prior occasions that a non-
discriminatory state law violated a right the Yakamas
reserved in the 1855 treaty.  All three cases involved the
"right of taking fish at all usual and accustomed places, in
common with citizens of the Territory."  Art. III, 12 Stat.
953.  In *United States* v. *Winans*, 198 U. S. 371 (1905), and
later again in *Seufert Brothers Co.* v. *United States*, 249
U. S. 194 (1919), we held that state trespass law could not
be used to prevent tribe members from reaching a historic
fishing site.  And in *Tulee* v. *Washington*, we held that
Washington could not punish a Yakama member for fish-
ing without a license.  We concluded that the license law
was preempted because the required fee "act[ed] upon the
Indians as a charge for exercising the very right their
ancestors intended to reserve"—the right to fish.  315

_____

   [1] There is something of an optical illusion in this case that may subtly
distort analysis.  It comes from the fact that the tax here happens to be
on motor fuel.  There is no claim, however, that the tax inhibits the
treaty right to travel because of the link between motor fuel and high-
way travel.  The question presented must be analyzed as if the tax were
imposed on goods of any sort.

U. S., at 685.

These three cases found a violation of the treaty when the challenged action—application of trespass law and enforcement of a license requirement—actually blocked the Yakamas from fishing at traditional locations. Applying the reasoning of those decisions to the Yakamas' right to travel, it follows that a State could not bar Yakama members from traveling on a public highway, or charge them a toll to do so.

Nothing of the sort is at issue here. The tax before us does not resemble a blockade or a toll. It is a tax on a product imported into the State, not a tax on highway travel. The statute says as much: "There is hereby levied and imposed . . . a tax . . . *on each gallon of motor vehicle fuel*." Wash. Rev. Code §82.36.020(1) (2012) (emphasis added). It is difficult to imagine how the legislature could more clearly identify the object of the tax. The tax is calculated per gallon of fuel; not, like a toll, per vehicle or distance traveled. It is imposed on the owner of the fuel, not the driver or owner of the vehicle—separate entities in this case. And it is imposed at the same rate on fuel that enters the State by methods other than a public highway—whether private road, rail, barge, or pipeline. §§82.36.010(4), 020(1), (2). Had Cougar Den filled up its trucks at a refinery or pipeline terminal in Washington, rather than trucking fuel in from Oregon, there would be no dispute that it was subject to the exact same tax. See §§82.36.020(2)(a), (b)(ii). Washington is taxing the fuel that Cougar Den imports, not Cougar Den's travel on the highway; it is not charging the Yakamas "for exercising the very right their ancestors intended to reserve." *Tulee*, 315 U. S., at 685.

It makes no difference that Washington happens to impose that charge when Cougar Den's drivers cross into Washington on a public highway. The time and place of the imposition of the tax does not change what is taxed,

and thus what activity—possession of goods or travel—is burdened. Say Washington imposes a tax on certain luxury goods, assessed upon first possession of the goods by a retail customer. A Yakama member who buys a mink coat at an off-reservation store in Washington will pay the tax. Yet, as the plurality acknowledges, under its view a tribal member who buys the same coat right over the state line in Portland and then drives back to the reservation will owe no tax—all because of a reserved right to travel on the public highways. *Ante*, at 15. That makes no sense. The tax charges individuals for possessing expensive furs. It in no way burdens highway travel.

The plurality devotes five pages to planting trees in hopes of obscuring the forest: to delving into irrelevancies about how the tax is assessed or collected, instead of the substance of what is taxed. However assessed or collected, the tax on 10,000 gallons of fuel is the same whether the tanker carrying it travels three miles in Washington or three hundred. The tax varies only with the amount of fuel. Why? Because the tax is on fuel, not travel. If two tankers travel 200 miles together from the same starting point to the same destination—one empty, one full of fuel—the full tanker will pay the fuel tax, the empty tanker will pay nothing. Their travel has been identical, but only the full one pays tax. Why? Because the tax is on fuel, not travel. The tax is on the owner of the fuel, not the owner of the vehicle. Why? You get the point.

The plurality responds that, even though the tax is calculated per gallon of fuel, it remains a tax on travel because it taxes a "feature" of travel. *Ante*, at 15. It is of course true that tanker trucks can be seen from time to time on the highways, but that hardly makes them a regular "feature" of travel, like the plurality's examples of axels or passengers. And we know that Washington is not taxing the gas insofar as it is a feature of Cougar Den's travel, because Washington imposes the exact same tax on

gas that is not in transit on the highways.

Rather than grappling with the substance of the tax, the plurality fixates on variations in the time and place of its assessment. The plurality thinks it significant that Washington does not impose the tax at the moment of entry on fuel that enters the State by pipeline or by a barge bound for a refinery, but instead when a tanker truck withdraws the fuel from the refinery or pipeline terminal. This may demonstrate that the tax is not on *first* possession of fuel in the State, as the plurality stresses, but it hardly demonstrates that the tax is not on possession of fuel *at all*. Regardless of how fuel enters the State, someone will eventually pay a per-gallon charge for possessing it. Washington simply assesses the fuel tax in each case upon the wholesaler. See 188 Wash. 2d 55, 60, 392 P. 3d 1014, 1016 (2017). This variation does not indicate, as the plurality suggests, that the fuel tax is somehow *targeted* at highway travel.

The plurality also says that it is bound by the Washington Supreme Court's references to the tax as an "importation tax" and tax on "the importation of fuel," *ante*, at 7 (quoting 188 Wash. 2d, at 67, 69, 392 P. 3d, at 1019, 1020), but these two references to the point at which the tax is *assessed* are not authoritative constructions of the *object* of the tax. The state court did not reject Washington's argument that this is a tax on fuel; instead, like the plurality today, it ignored that argument and concluded that the tax was invalid simply because Washington imposed it while Cougar Den was traveling on the highway. In any event, the state court more often referred to the tax as a "tax on fuels" or "fuel tax[ ]." *Id.*, at 58–61, 392 P. 3d, at 1015–1016.

After the five pages arguing that a tax expressly labeled as on "motor vehicle fuel" is actually a tax on something else, the plurality concludes . . . it doesn't matter. As the plurality puts it at page nine of its opinion, "even if" the

tax is on fuel and not travel, it is preempted because it has
"the practical effect of burdening" the Yakamas' right to
travel on the highways. The plurality's rule—that States
may not enforce general legislation that has an effect on
the Yakamas while they are traveling—has no basis in our
precedents, which invalidated laws that punished or
charged the Yakamas simply for exercising their reserved
rights. The plurality is, of course, correct that the tres-
pass law in *Winans* did not target fishing, but it effectively
made illegal the very act of fishing at a traditional loca-
tion. Here, it is the possession of commercial quantities of
fuel that exposes the Yakamas to liability, not travel itself
or any integral feature of travel.

The concurrence reaches the same result as the plural-
ity, but on different grounds. Rather than holding that the
treaty preempts any law that burdens the Yakamas while
traveling on the highways, the concurrence reasons that
the fuel tax is preempted because it regulates the posses-
sion of goods, and the Yakamas' right to travel includes
the right to travel with goods. *Ante*, at 7–8. But the right
to travel with goods is just an application of the right to
travel. It means the Yakamas enjoy the same privileges
whether they travel with goods or without. It does not
provide the Yakamas with an additional right to carry any
and all goods on the highways, tax free, in any manner
they wish.[2] The concurrence purports to find this addi-
tional right in the record of the treaty negotiations, but

————————

[2] The plurality simply assumes that the right to travel with goods is
an additional, substantive right when it reasons that the fuel tax is
preempted because it taxes an "integral feature" of travel with goods.
*Ante*, at 16. The concurrence makes the same assumption when it
compares the fuel tax to a tax on " 'possession' of fish" *Ante*, at 8. That
tax would be preempted because "taking possession of fish" is just
another way of describing the act of fishing. But possession of a tanker
full of fuel is not an integral feature of travel, which is the relevant
activity protected by the treaty.

the record shows only that the Yakamas wanted to ensure they could continue to travel to the places where they traded. They did not, and did not intend to, insulate the goods they carried from all regulation and taxation.

Nothing in the text of the treaty, the historical record, or our precedents supports the conclusion that the right "to travel upon all public highways" transforms the Yakamas' vehicles into mobile reservations, immunizing their contents from any state interference. Before it reaches the reservation, the fuel in Cougar Den's tanker trucks is always susceptible to state regulation—it does not pass in and out of state authority with every exit off or entry onto the road.

Recognizing the potentially broad sweep of its new rule, the plurality cautions that it does not intend to deprive the State of the power to regulate when necessary "to prevent danger to health or safety occasioned by a tribe member's exercise of treaty rights." *Ante*, at 17. This escape hatch ensures, the plurality suggests, that the treaty will not preempt essential regulations that burden highway travel. *Ante*, at 9–10. I am not so confident.

First, by its own terms, the plurality's health and safety exception is limited to laws that regulate dangers "occasioned by" a Yakama's travel. That would seem to allow speed limits and other rules of the road. But a law against possession of drugs or illegal firearms—the dangers of which have nothing to do with travel—does not address a health or safety risk "occasioned by" highway driving. I do not see how, under the plurality's rule or the concurrence's, a Washington police officer could burden a Yakama's travel by pulling him over on suspicion of carrying such contraband on the highway.

But the more fundamental problem is that this Court has never recognized a health and safety exception to reserved treaty rights, and the plurality today mentions the exception only in passing. Importantly, our prece-

dents—all of which concern hunting and fishing rights—
acknowledge the authority of the States to regulate Indi-
ans' exercise of their reserved rights only in the interest of
*conservation.* See *Tulee*, 315 U. S., at 684 ("[T]he treaty
leaves the state with power to impose on Indians, equally
with others, such restrictions . . . as are necessary for the
conservation of fish . . . ."); see also *Minnesota* v. *Mille
Lacs Band of Chippewa Indians*, 526 U. S. 172, 205 (1999)
("We have repeatedly reaffirmed state authority to impose
reasonable and necessary nondiscriminatory regulations
on Indian hunting, fishing, and gathering rights in the
interest of conservation."); *Confederated Tribes of Colville
Reservation* v. *Anderson*, 903 F. Supp. 2d 1187, 1197 (ED
Wash. 2011) ("Notably absent from the binding Supreme
Court and Ninth Circuit cases dealing with state regula-
tion of 'in common' usufructuary rights is any reference to
a state's exercise of its public-safety police power."). In-
deed, this Court had previously assured the Yakamas that
"treaty fishermen are *immune from all regulation save
that required for conservation.*" *Washington* v. *Washing-
ton State Commercial Passenger Fishing Vessel Assn.*, 443
U. S. 658, 682 (1979) (emphasis added). Adapted to the
travel right, the conservation exception would presumably
protect regulations that preserve the subject of the Yaka-
mas' right by maintaining safe and orderly travel on the
highways. But many regulations that burden highway
travel (such as emissions standards, noise restrictions, or
the plurality's hypothetical ban on the importation of
plutonium) do not fit that description.

The need for the health and safety exception, of course,
follows from the overly expansive interpretation of the
treaty right adopted by the plurality and concurrence.
Today's decision digs such a deep hole that the future
promises a lot of backing and filling. Perhaps there are
good reasons to revisit our long-held understanding of
reserved treaty rights as the plurality does, and adopt a

broad health and safety exception to deal with the inevitable fallout. Hard to say, because no party or *amicus* has addressed the question.

The plurality's response to this important issue is the following, portentous sentence: "The record of the treaty negotiations may not support the contention that the Yakamas expected to use the roads entirely unconstrained by laws related to health or safety." *Ante*, at 17. A lot of weight on two words, "may not." The plurality cites assurances from the territorial Governor of Washington that the United States would make laws to prevent "bad white men" from harming the Yakamas, and that the United States expected the Yakamas to exercise similar restraint in return. *Ante*, at 18. What this has to do with health and safety regulations affecting the highways (or fishing or hunting) is not clear.

In the meantime, do not assume today's decision is good news for tribal members across the country. Application of state safety regulations, for example, could prevent Indians from hunting and fishing in their traditional or preferred manner, or in particular "usual and accustomed places." I fear that, by creating the need for this untested exception, the unwarranted expansion of the Yakamas' right to travel may undermine rights that the Yakamas and other tribes really did reserve.

The concurrence does not mention the plurality's possible health and safety exception, but observes that the Yakamas expected to follow laws that "facilitate the safe use of the roads by Indians and non-Indians alike." *Ante*, at 11. The State is therefore wrong, the concurrence says, to contend that a decision exempting Cougar Den's fuel from taxation would call into question speed limits and reckless driving laws. But that is not the State's principal argument. The State acknowledges that laws facilitating safe travel on the highways would fall within the long-recognized conservation exception. See Tr. of Oral Arg.

12–13. The problem is that today's ruling for Cougar Den preempts the enforcement of any regulation of *goods* on the highway that does not concern *travel* safety—such as a prohibition on the possession of potentially contaminated apples taken from a quarantined area (a matter of vital concern in Washington). See *id.*, at 13; Brief for Petitioner 44.

The concurrence says not to worry, the apples could be regulated and inspected where they are grown, or when they arrive at a market. Or, if the Yakamas are taking the apples back to the reservation, perhaps the Federal Government or the Tribe itself could address the problem there. *Ante*, at 10. What the concurrence does not say is that the State could regulate the contraband apples on the highway. And there is no reason offered why other contraband should be treated any differently.

Surely the concurrence does not mean to suggest that the parties to the 1855 treaty intended to confer on the Tribe the right to travel with illegal goods, free of any regulation. But if that is not the logical consequence of the decision today, the plurality and the concurrence should explain why. It is the least they should do.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 16–1498

WASHINGTON STATE DEPARTMENT OF LICENSING, PETITIONER *v.* COUGAR DEN, INC.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WASHINGTON

[March 19, 2019]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS joins, dissenting.

The text of the 1855 treaty between the United States and the Yakama Tribe affords the Tribe a "right, in common with citizens of the United States, to travel upon all public highways." Treaty Between the United States and the Yakama Nation of Indians, Art. III, June 9, 1855, 12 Stat. 953. The treaty's "in common with" language means what it says. The treaty recognizes tribal members' right to travel on off-reservation public highways on equal terms with other U. S. citizens. Under the text of the treaty, the tribal members, like other U. S. citizens, therefore still remain subject to *nondiscriminatory* state highway regulations—that is, to regulations that apply equally to tribal members and other U. S. citizens. See *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148–149 (1973). That includes, for example, speed limits, truck restrictions, and reckless driving laws.

The Washington law at issue here imposes a nondiscriminatory fuel tax. THE CHIEF JUSTICE concludes that the fuel tax is not a highway regulation and, for that reason, he says that the fuel tax does not infringe the Tribe's treaty right to travel on the public highways. I agree with THE CHIEF JUSTICE and join his dissent.

Even if the fuel tax is a highway regulation, it is a *non-*

*discriminatory* highway regulation.  For that reason as well, the fuel tax does not infringe the Tribe's treaty right to travel on the public highways on equal terms with other U. S. citizens.

The plurality, as well as the concurrence in the judgment, suggests that the treaty, if construed that way, would not have been important to the Yakamas.  For that reason, the plurality and the concurrence would not adhere to that textual meaning and would interpret "in common with" other U. S. citizens to mean, in essence, "exempt from regulations that apply to" other U. S. citizens.

I respectfully disagree with that analysis.  The treaty right to travel on the public highways "in common with"— that is, on equal terms with—other U. S. citizens was important to the Yakama tribal members at the time the treaty was signed.  That is because, as of 1855, States and the Federal Government sometimes required tribal members to seek permission before leaving their reservations or even prohibited tribal members from leaving their reservations altogether.  See, *e.g.,* Treaty Between the United States of America and the Utah Indians, Art. VII, Dec. 30, 1849, 9 Stat 985; Mo. Rev. Stat., ch. 80, §10 (1845).  The Yakamas needed to travel to sell their goods and trade for other goods.  As a result, those kinds of laws would have devastated the Yakamas' way of life.  Importantly, the terms of the 1855 treaty made crystal clear that those kinds of travel restrictions could not be imposed on the Yakamas.

In particular, the treaty afforded Yakama tribal members two relevant rights.  First was "free access" on roads from the reservation to "the nearest public highway." Art. III, 12 Stat. 953.  Second was a right to travel "in common with" other U. S. citizens on "all public highways." *Ibid.* The right to free access from the reservation to public highways, combined with the right to travel off

reservation on public highways, facilitated the Yakama tribal members' extensive trading network.

In determining the meaning of the "in common with" language, we must recognize that the treaty used different language in defining (1) the right to "free access," which applies only on roads connecting the reservation to the off-reservation public highways, and (2) the right to travel "in common with" other U. S. citizens, which applies on those off-reservation public highways. The approach of the plurality and the concurrence would collapse that distinction between the "free access" and "in common with" language and thereby depart from the text of the treaty. I would stick with the text. The treaty's "in common with" language—both at the time the treaty was signed and now—means what it says: the right for Yakama tribal members to travel on public highways on equal terms with other U. S. citizens.

To be sure, the treaty as negotiated and written may not have turned out to be a particularly good deal for the Yakamas. As a matter of separation of powers, however, courts are bound by the text of the treaty. See *Oregon Dept. of Fish and Wildlife* v. *Klamath Tribe*, 473 U. S. 753, 774 (1985). It is for Congress and the President, not the courts, to update a law and provide additional compensation or benefits to tribes beyond those provided by an old law. And since 1855, and especially since 1968, Congress has in fact taken many steps to assist tribes through a variety of significant legislative measures. In short, lament about the terms of the treaty negotiated by the Federal Government and the Tribe in 1855 does not support the Judiciary (as opposed to Congress and the President) rewriting the law in 2019.

What about precedent? It is true that some of our older precedents interpreted similar "in common with" treaty language regarding fishing rights to grant tribal members an exemption from certain fishing regulations, even when

the fishing regulations were nondiscriminatory. But as we explained in the most recent of those fishing cases, those nondiscriminatory fishing regulations had the effect of preventing the Tribes from catching a fair share of the fish in the relevant area. In other words, the fishing regulations at issue were discriminatory in effect even though nondiscriminatory on their face. See *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 676, n. 22 (1979).

That rationale for departing from the treaty text in the narrow context of the fishing cases does not apply in the highway context. Facially nondiscriminatory highway regulations—such as speed limits, truck restrictions, and reckless driving laws—are also nondiscriminatory in effect, as relevant here. They do not deprive tribal members of use of the public highways or deprive tribal members of a fair share of the public highways.

Washington's facially nondiscriminatory fuel tax is likewise nondiscriminatory in effect. The Washington fuel tax therefore does not violate the key principle articulated in the fishing cases. I would adhere to the text of the treaty and hold that the tribal members, like other citizens of the State of Washington, are subject to the nondiscriminatory fuel tax.

The Court (via the plurality opinion and the concurrence) disagrees. The Court relies on the fishing cases and fashions a new right for Yakama tribal members to disregard even nondiscriminatory highway regulations, such as the Washington fuel tax and perhaps also Washington's similarly structured cigarette tax. The Court's newly created right will allow Yakama businesses not to pay state taxes that must be paid by other competing businesses, including by businesses run by members of the many other tribes in the State of Washington. As a result, the State of Washington (along with other States) stands to lose millions of dollars annually in tax revenue, which

will necessarily mean fewer services or increased taxes for other citizens and tribes in the State.

In addition, the Court's newly created right—if applied across the board—would seem to afford Yakama tribal members an exemption from all manner of highway regulations, ranging from speed limits to truck restrictions to reckless driving laws. No doubt because of those negative real-world consequences, the Court simultaneously fashions a new health and safety exception.* But neither the right nor the exception comes from the text of the treaty. As THE CHIEF JUSTICE explains, the Court's "need for the health and safety exception, of course, follows from the overly expansive interpretation of the treaty right adopted by the plurality and concurrence." *Ante*, at 8.

I share THE CHIEF JUSTICE's concern that the Court's new right for tribal members to disregard even nondiscriminatory highway regulations and the Court's new exception to that right for health and safety regulations could generate significant uncertainty and unnecessary litigation for States and tribes. THE CHIEF JUSTICE says it well: The Court "digs such a deep hole that the future promises a lot of backing and filling." *Ibid.*

Instead of judicially creating a new atextual right for tribal members to disregard nondiscriminatory highway regulations and then backfilling by judicially creating a new atextual exception to that right for health and safety regulations, I would adhere to the text of the treaty and leave it to Congress, if it chooses, to provide additional benefits for the Yakamas. In my respectful view, even when we interpret any ambiguities in the treaty in favor of the Tribe, the treaty phrase "in common with" cannot properly be read to exempt tribal members from nondiscriminatory highway regulations.

——————

*I understand both the plurality opinion and the concurrence to approve of a health and safety exception.

In sum, under the treaty, Washington's nondiscrimina-tory fuel tax may be imposed on Yakama tribal members just as it may be imposed on other citizens and tribes in the State of Washington.  I respectfully dissent.